93 F.3d 617
 96 Cal. Daily Op. Serv. 6187, 96 Daily Journal
D.A.R. 10,127
SEPARATION OF CHURCH AND STATE COMMITTEE; Jeff Lewis; Jimi
Mathers, Plaintiffs-Appellants,
v.
CITY OF EUGENE OF LANE COUNTY, STATE OF OREGON, a Municipal
Corporation, Defendant-Appellee.
 No. 93-35094.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 16, 1994.
Decided Aug. 20, 1996.
 
 Charles O. Porter, Eugene, Oregon, for plaintiffs-appellants.
 William F. Gary, Harrang, Long, Watkinson, Laird & Rubinstein, Eugene, Oregon, for defendant-appellee.
 David Schuman and Allen L. Johnson, American Civil Liberties Union Foundation of Oregon, Eugene, for amicus ACLU.
 Steven K. Green, Americans United for Separation of Church and State, Silver Springs, Maryland, for amicus Americans United.
 Appeal from the United States District Court for the District of Oregon, Michael R. Hogan, District Judge, Presiding. D.C. No. CV-91-06164-MRH.
 Before LAY,* PREGERSON and O'SCANNLAIN, Circuit Judges.
 Per Curiam Opinion; Concurrence by Judge O'SCANNLAIN.
 PER CURIAM.
 
 
 1
 In this second of two similar cases,[1] we must decide whether the City of Eugene, Oregon violates the Establishment Clause of the United States Constitution by its ownership and display of a fifty-one foot concrete Latin cross in a public park on Skinner's Butte.
 
 
 2
 * The City of Eugene ("City") maintains a public park on and around Skinner's Butte, a hill cresting immediately north of the City's downtown business district. The land was donated to the City and has been maintained as a public park for many years. From the late 1930s to 1964, private individuals erected a succession of wooden crosses in the park, one replacing another as they deteriorated. In 1964, private individuals erected the cross at issue in this litigation. It is a fifty-one foot concrete Latin cross with neon inset tubing, and it is located at the crest of Skinner's Butte. The parties who erected the cross did not seek the City's permission to do so beforehand; however, they subsequently applied for and received from the City a building permit and an electrical permit.
 
 
 3
 Since 1970, the City has illuminated the cross for seven days during the Christmas season, five days during the Thanksgiving season, and on Memorial Day, Independence Day, and Veteran's Day.
 
 
 4
 The cross has been the subject of litigation since the time it was erected. In 1969, the Oregon Supreme Court held that the cross violated both the federal and the Oregon Constitutions because it was erected with a religious purpose and created the inference of official endorsement of Christianity. Lowe v. City of Eugene, 254 Or. 518, 463 P.2d 360, 362-63 (1969), cert. denied, 397 U.S. 1042, 90 S.Ct. 1366, 25 L.Ed.2d 654, reh'g denied, 398 U.S. 944, 90 S.Ct. 1838, 26 L.Ed.2d 283 (1970). Soon after, the City held a charter amendment election, and on May 26, 1970, the voters, by a wide margin, approved an amendment to the City Charter designating the cross a war memorial. Pursuant to that amendment, the cross was deeded to the City as a gift, and a bronze plaque was placed at the foot of the cross dedicating it as a memorial to war veterans. The Eugene City Charter provides that the "concrete cross on the south slope of the butte shall remain at that location and in that form as property of the city and is hereby dedicated as a memorial to the veterans of all wars in which the United States has participated."
 
 
 5
 After the election, the parties who erected the cross brought suit to have Lowe set aside. The Oregon Supreme Court did so on the basis of the "changed circumstances" that had occurred since Lowe was decided and held that the cross no longer violated the state and federal constitutions. Eugene Sand and Gravel, Inc. v. City of Eugene, 276 Or. 1007, 558 P.2d 338, 345 (1976), cert. denied, 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977).
 
 
 6
 In this case, Separation of Church and State Committee ("Separation"),[2] brought suit in the United States District Court for the District of Oregon seeking injunctive and declaratory relief under 42 U.S.C. § 1983, alleging a violation of the Establishment Clause of the United States Constitution.[3] The parties filed cross-motions for summary judgment, and the district court granted the City's motion. The district court held that the cross has a secular purpose, does not advance religion, and does not foster an excessive entanglement with religion. See Lemon v. Kurtzman, 403 U.S. 602, 612-13, 91 S.Ct. 2105, 2111-12, 29 L.Ed.2d 745 (1971).
 
 II
 
 7
 The fifty-one foot Latin cross located in a public park on Skinner's Butte clearly represents governmental endorsement of Christianity. The maintenance of the cross in a public park by the City of Eugene may reasonably be perceived as providing official approval of one religious faith over others.
 
 
 8
 The Supreme Court has focused Establishment Clause analysis on whether governmental practice has the effect of endorsing religion. Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989). As Justice Blackmun observed for the Court in Allegheny:
 
 
 9
 Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion, see, e.g., Texas Monthly, Inc. v. Bullock, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989)), it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982).
 
 
 10
 Id. at 605, 109 S.Ct. at 3107.
 
 
 11
 In the present case, the City urges that the cross is no longer a religious symbol but a war memorial. This argument, however, fails to withstand Establishment Clause analysis. In Grand Rapids School District v. Ball, 473 U.S. 373, 390, 105 S.Ct. 3216, 3226, 87 L.Ed.2d 267 (1985), the Supreme Court stated:
 
 
 12
 It follows that an important concern of the effects test is whether the symbolic union of church and state effected by the challenged governmental action is sufficiently likely to be perceived by adherents of the controlling denominations as an endorsement, and by the nonadherents as a disapproval, of their individual religious choices.
 
 
 13
 Id. (emphasis added). Furthermore, as Justice O'Connor observed in her concurring opinion in Lynch v. Donnelly, 465 U.S. 668, 687, 104 S.Ct. 1355, 1366-67, 79 L.Ed.2d 604 (1984), the "effect" prong of the Lemon test "asks whether, irrespective of government's actual purpose, the practice ... in fact conveys a message of endorsement or disapproval." Id. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring); see also Wallace v. Jaffree, 472 U.S. 38, 56 n. 42, 105 S.Ct. 2479, 2489-90 n. 42, 86 L.Ed.2d 29 (1985) (quoting Lynch, 465 U.S. at 690, 104 S.Ct. at 1368 (O'Connor, J., concurring)).
 
 
 14
 There is no question that the Latin cross is a symbol of Christianity, and that its placement on public land by the City of Eugene violates the Establishment Clause. Because the cross may reasonably be perceived as governmental endorsement of Christianity, the City of Eugene has impermissibly breached the First Amendment's "wall of separation" between church and state.[4]
 
 REVERSED and REMANDED.[5]
 
 15
 O'SCANNLAIN, Circuit Judge, concurring in the result:
 
 
 16
 I concur in the result but not in the court's legal analysis. I write separately because I believe the court owes the people of the City of Eugene a better explanation of why, having been judicially reviewed four times over the last twenty-five years, the very cross at issue in this appeal has been first condemned, then twice approved, and now once again condemned, all by well-intentioned judges seeking to apply the Establishment Clause of the United States Constitution. I write separately, as well, to emphasize that the court applies the wrong legal standard, notwithstanding it reaches the judgment compelled by current Supreme Court jurisprudence.
 
 
 17
 * The text of the Establishment Clause, the deliberations of the framers, and the practices that were prevalent at the time the First Amendment was passed all suggest that the Establishment Clause was intended to serve a relatively limited purpose and was so regarded for over a century and a half of our constitutional history. By contrast, however, the Supreme Court in the last half-century has constructed and zealously policed a "wall of separation" between church and state that was unknown and, indeed, unthinkable at the time of the framing. Wallace v. Jaffree, 472 U.S. 38, 106, 105 S.Ct. 2479, 2515, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting).[1]
 
 
 18
 Inclusion of the Establishment Clause in the Bill of Rights validates Justice Douglas' eloquent and oft-quoted exclamation: "We are a religious people whose institutions presuppose a Supreme Being." Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 683-84, 96 L.Ed. 954 (1952). The text of the Clause and the deliberations of the framers indicate that the Establishment Clause was designed to prevent Congress from establishing a national religion--that is, from officially preferring one religious sect over others. Wallace, 472 U.S. at 99, 105 S.Ct. at 2511-12; see Lee v. Weisman, 505 U.S. 577, 639-41, 112 S.Ct. 2649, 2683, 120 L.Ed.2d 467 (1992) (Scalia, J., dissenting).[2] The Clause did not target the establishment of religions as such. This we know because several states maintained established religions at the time the First Amendment was ratified and continued to maintain them for many years.[3] We can thus infer that the Establishment Clause was not designed to embody a general theory governing the appropriate relationship between government and religion. Rather, its purpose was far more limited: to prohibit Congress from legislating on the subject of religion, thereby leaving church-state relations to the individual states. Id. at 1133. Hence, concerns about federalism, not about governmental endorsement of religion per se, motivated ratification of the Establishment Clause. Id. at 1134.[4]
 
 
 19
 Further, the practices that were prevalent and accepted during the early history of this Nation lead to the conclusion that, even as to the national government, the Establishment Clause was not intended to erect a "wall of separation" between church and state. Rather, the accommodation of religion was not only permitted but encouraged. For instance, our national government has, throughout its history, manifested an abiding belief in the value of prayer. In his first inaugural address, George Washington deliberately included a prayer as part of his first official act as President. Lee, 505 U.S. at 632-33, 112 S.Ct. at 2679. Since then, Congress has directed the President to proclaim a National Day of Prayer. See 36 U.S.C. § 169h.
 
 
 20
 Other official acts likewise illustrate our government's traditional accommodation of religion. "In the very week that Congress approved the Establishment Clause as part of the Bill of Rights for submission to the states, it enacted legislation providing for paid Chaplains for the House and Senate." Lynch v. Donnelly, 465 U.S. 668, 674, 104 S.Ct. 1355, 1359-60, 79 L.Ed.2d 604 (1984). Further, President Washington and his successors proclaimed Thanksgiving--a religious holiday for giving thanks to God for the gifts of Nature--a day of national celebration, and Congress made it a National Holiday more than a century ago. Id. at 675, 104 S.Ct. at 1360. Additional examples of accommodation include our statutorily prescribed national motto "In God We Trust," and the "One nation under God" language of our Pledge of Allegiance. Id. at 676, 104 S.Ct. at 1360-61.
 
 
 21
 Beginning in 1947, however, Establishment Clause jurisprudence marked a sharp break with the original understanding of the Clause. In Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), Justice Black, writing for a five-member majority, adopted Jefferson's "wall of separation" metaphor as the theoretical centerpiece driving the religion clauses of the First Amendment. That metaphor became the focus for subsequent Establishment Clause analysis and set a philosophical tone that resonated through all post-World War II decisions regarding church and state. Operating under the assumption that the "wall of separation" represented the Establishment Clause's correct meaning, the Court gradually developed a series of tests designed to determine if a particular governmental practice or statute impermissibly breached that wall. The culmination of this jurisprudential development occurred in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), where the Court announced a three-pronged test to evaluate Establishment Clause claims. In order to pass constitutional muster under Lemon, a government practice must have a secular purpose; it must neither advance nor inhibit religion in its principal or primary effect; and it must not foster an excessive entanglement with religion. Id. at 612-13, 91 S.Ct. at 2111-12.
 
 II
 
 22
 The Lemon test has been repeatedly attacked both by members of the Court, see Lamb's Chapel v. Center Moriches School Dist., 508 U.S. 384, 396-400, 113 S.Ct. 2141, 2149-50, 124 L.Ed.2d 352 (1993) (Scalia, J., concurring in the judgment) ("Like some ghoul in a late-night horror movie ..., Lemon stalks our Establishment Clause jurisprudence...."); Wallace, 472 U.S. at 108-12, 105 S.Ct. at 2516-19 (Rehnquist, J., dissenting), and by commentators, see Lamb's Chapel, 508 U.S. at 398-400, 113 S.Ct. at 2150 (listing sources). In light of its lack of historical grounding, Lemon has, not surprisingly, given rise to a startling number of 5-4 decisions, "hopelessly divided pluralities," Wallace, 472 U.S. at 107, 105 S.Ct. at 2515-16, and the kind of fractured and incoherent doctrinal path that one would expect from an attempt "to craft a workable rule from a historically faulty doctrine." Id. at 111, 105 S.Ct. at 2518; see also Board of Educ. of Kiryas Joel v. Grumet, 512 U.S. 687, ----, 114 S.Ct. 2481, 2506, 129 L.Ed.2d 546 (1994) (Scalia, J., dissenting) ("Once this Court has abandoned text and history as guides, nothing prevents it from calling religious toleration the establishment of religion.").
 
 
 23
 Despite Lemon 's purported shortcomings, the Court has yet to abandon it. See Kiryas Joel, 512 U.S. at ----, 114 S.Ct. at 2495 (Blackmun, J., concurring) (observing that the opinion of the Court relied upon several decisions that explicitly rested on the criteria set forth in Lemon ); Lamb's Chapel, 508 U.S. at 394-96, 113 S.Ct. at 2148 (relying on Lemon ). However, in a handful of distinct cases, the Court has avoided the application of Lemon. See Lee v. Weisman, 505 U.S. 577, 586-88, 112 S.Ct. 2649, 2655, 120 L.Ed.2d 467 (1992) (striking down graduation prayer without applying Lemon because "pervasive" nature of the religious activity conflicted with settled precedent regarding public school prayer); Marsh v. Chambers, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (upholding legislative prayer without applying Lemon because of the "unique history" of the practice). And, in one case, the Court borrowed from Equal Protection jurisprudence in order to apply strict scrutiny to a tax exemption statute that discriminated against less well-established religions. Larson v. Valente, 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). In Larson, the Court held that the Establishment Clause was violated by a provision of Minnesota's charitable solicitations act that exempted only those religious organizations that receive more than half of their total contributions from members or affiliated organizations. The legislative history revealed that the statute was drafted with "the explicit intention of including particular religious denominations and excluding others." Id. at 254, 102 S.Ct. at 1688-89. In applying strict scrutiny, the Court noted that "the Lemon v. Kurtzman 'tests' are intended to apply to laws affording a uniform benefit to all religions, and not to provisions ... that discriminate among religions." Id. at 252, 102 S.Ct. at 1687-88 (footnote omitted).[5]
 
 
 24
 As the Supreme Court's subsequent decisions have made clear, Larson 's strict scrutiny approach is limited to cases where a government statute or practice explicitly discriminates against a certain religious group. See Kiryas Joel, 512 U.S. at ----, ----, 114 S.Ct. at 2495, 2500 (O'Connor, J., concurring) (noting that "[c]ases involving government speech on religious topics," such as Allegheny and Lynch [involving religious symbols on government property], unlike cases such as Larson, "require an analysis focusing on whether the speech endorses or disapproves of religion, rather than on whether the government action is neutral with regard to religion"); Lynch v. Donnelly, 465 U.S. 668, 679, 104 S.Ct. 1355, 1362, 79 L.Ed.2d 604 (1984) (noting that the Court did not "find Lemon useful in Larson ... where there was substantial evidence of overt discrimination against a particular church"); see also Michael J. Simpson, Accommodating Indian Religions: The Proposed 1993 Amendment to the American Indian Religious Freedom Act, 54 Mont. L.Rev. 19, 50-51 (1993) ("Subsequent cases ... have limited Larson 's strict scrutiny test to statutes which single out and discriminate against certain religious denominations and have not applied the Larson test to laws which merely accommodate religious practices.").
 
 
 25
 Moreover, the Supreme Court has never applied Larson 's strict scrutiny approach in a case involving a religious display on government property; rather, the Court has consistently applied the Lemon test, or some variation on Lemon, such as the endorsement test. See Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989) (applying endorsement test, which is refinement of second prong of Lemon test, in case involving creche and menorah on government property); Lynch, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (applying Lemon in case involving government-owned creche on government property); see also id. at 687, 694, 104 S.Ct. at 1366, 1370 (O'Connor, J., concurring) ("Every government practice must be judged in its unique circumstances to determine whether it constitutes an endorsement or disapproval of religion.").[6]
 
 
 26
 In Allegheny, the Court invoked Lemon and relegated Larson to a footnote citing examples of impermissible discrimination "among persons on the basis of their religious beliefs and practices." Allegheny, 492 U.S. at 590-91 & n. 41, 109 S.Ct. at 3099-3100 & n. 41. In Lynch, the Court expressly refused to apply Larson 's strict scrutiny test to a creche owned and displayed by the city of Pawtucket, R.I.: "[W]e are unable to see this display, or any part of it, as explicitly discriminatory in the sense contemplated in Larson." Lynch, 465 U.S. at 687 n. 13, 104 S.Ct. at 1366 n. 13; see also id. at 687, 688 n. *, 104 S.Ct. at 1366, 1367 n. * (O'Connor, J., concurring) (noting that the Larson standard "may be assimilated to the Lemon test in" the endorsement test enunciated by Justice O'Connor).
 
 III
 
 27
 Thirteen years after the Supreme Court of Oregon decided that the Skinner's Butte cross did not violate the Establishment Clause, see Eugene Sand and Gravel, Inc. v. City of Eugene, 276 Or. 1007, 558 P.2d 338 (1976), cert. denied, 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977), the Supreme Court of the United States decided Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989). In my view, Allegheny controls the disposition of this case. Although the court here cites Allegheny, it fails to perform the careful scrutiny of the cross' context which Allegheny requires, particularly the cross' historical significance as an officially-designated war memorial. Instead, the court errs by resting its holding solely on the naked assertion that a "Latin cross is a symbol of Christianity."
 
 
 28
 Allegheny concerned the constitutionality of two holiday displays located on public property in downtown Pittsburgh: a creche and an eighteen-foot menorah. The creche was located on the Grand Staircase of the Allegheny County Courthouse. The creche was surrounded by poinsettias and topped with an angel bearing a banner proclaiming "Gloria in Excelsis Deo!" One block away, the menorah was displayed under an arch outside the City-County Building. Next to the menorah, and under the building's middle arch, was a forty-five-foot Christmas tree that was decorated with lights and ornaments. A sign was placed at the foot of the tree bearing the mayor's name and entitled "Salute to Liberty." Beneath the title, the sign stated:
 
 
 29
 During this holiday season, the city of Pittsburgh salutes liberty. Let these festive lights remind us that we are the keepers of the flame of liberty and our legacy of freedom.
 
 
 30
 Allegheny, 492 U.S. at 581-82, 109 S.Ct. at 3094-95.
 
 
 31
 In evaluating the displays' constitutionality, the Court, adopting Justice O'Connor's phraseology, stated that "[i]n recent years, we have paid particularly close attention to whether the challenged governmental practice either has the purpose or effect of 'endorsing' religion...." Id. at 592, 109 S.Ct. at 3100.
 
 
 32
 In the course of adjudicating specific cases, this Court has come to understand the Establishment Clause to mean that government may not promote or affiliate itself with any religious doctrine or organization, may not discriminate among persons on the basis of their religious beliefs and practices, may not delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs.
 
 
 33
 Id. at 590-91, 109 S.Ct. at 3099-3100. The endorsement test applied in Allegheny is a refinement of the second prong of the test provided in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).
 
 
 34
 The Court's application of the endorsement test in Allegheny required careful scrutiny of the context in which the religious symbols were displayed. By a 6-3 vote, the Court determined that the menorah did not have the prohibited effect of endorsing religion given its "particular physical setting." Allegheny, 492 U.S. at 621, 109 S.Ct. at 3115. The display of the menorah in conjunction with the large Christmas tree served merely to celebrate the "winter holiday season." Id. at 620, 109 S.Ct. at 3115. The tree, because of its size and location, served to downplay the menorah and enabled the menorah to communicate the message that Christmas is not the only way to celebrate the season. Id. at 617-18, 109 S.Ct. at 3113-14.
 
 
 35
 The same could not be said for the creche. By a 5-4 vote, the Court concluded that, in the context in which it was displayed, the creche violated the Establishment Clause because it could be seen as a governmental observance of Christmas, "as a Christian holy day" instead of merely acknowledging Christmas as a "cultural phenomenon." Id. at 601, 109 S.Ct. at 3105. By displaying the creche in the "main" and "most beautiful" part of the building that is the seat of county government, "the county sends an unmistakable message that it supports and promotes the Christian praise to God that is the creche's religious message." Id. at 599-600, 109 S.Ct. at 3104-05.[7] The Court distinguished the creche in Allegheny from the creche that it found constitutionally permissible in Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), on the ground that the creche in Lynch was displayed along with other secular Christmas decorations that each had a "specific visual story to tell." Allegheny, 492 U.S. at 598, 109 S.Ct. at 3103-04. By contrast, because the Allegheny creche stood alone, the Court found that there was nothing to detract from the display's sectarian message. Id.
 
 IV
 
 36
 Here, the City of Eugene argues, and the district court found, that the cross does not convey a message of governmental endorsement of religion.[8] The cross was dedicated as a war memorial by a majority of the voters over twenty years ago, and for thirty years prior to that, a series of crosses stood at the same location without any official sponsorship by the City. The plaque on the cross clearly shows its status as a war memorial as does the original City Charter provision.[9] From these facts, the City maintains that a reasonable observer would recognize the cross for what it is--a war memorial--and not an attempt by the City to approve or disapprove of the Christian religion.[10]
 
 
 37
 Further, the setting of the cross, which factor was so important in Allegheny, supports constitutionality. As the district court observed, the cross stands in a park, in relative isolation, and far from any government buildings or other structures.[11] Thus, the location of the cross contrasts sharply with the creche in Allegheny, which sat on "the Grand Staircase, the 'main' and 'most beautiful part' of the building that is the seat of county government." Allegheny, 492 U.S. at 599, 109 S.Ct. at 3104. As the Court held, "[n]o viewer could reasonably think that [the creche] occupies this location without the support and approval of the government." Id. at 599-600, 109 S.Ct. at 3104-05. By contrast, because the cross on Skinner's Butte stands so remote from any government buildings, one can argue that no similar appearance of endorsement occurs.
 
 
 38
 While the City's argument has a great deal of merit, Allegheny nevertheless compels the conclusion that the City's display of the cross is unconstitutional. Under the Allegheny analysis, the Establishment Clause "prohibits government from appearing to take a position on questions of religious belief...." Id. at 593-94, 109 S.Ct. at 3100-02. Though the cross has a secular purpose as a war memorial, observers might reasonably perceive the City's display of such a religious symbol on public property as government endorsement of the Christian faith.[12] Further, the City's use of a cross to memorialize the war dead may lead observers to believe that the City has chosen to honor only Christian veterans.
 
 V
 
 39
 Although I cannot speak for the court which unanimously holds the City's ownership unconstitutional, I would observe that the obligation to correct a violation of the Establishment Clause does not require destruction of the landmark that the citizens of Eugene voted overwhelmingly to retain.[13] The district court has discretion to consider the full range of remedies (including, for instance, permitting the City to sell the underlying property to a non-governmental entity or permitting sale of the cross and removal to a privately-owned site). See Ellis v. City of La Mesa, 990 F.2d 1518, 1528-29 (9th Cir.1993) (discussing remedies), cert. denied, 512 U.S. 1220, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994).
 
 
 40
 Despite its secular purpose as a war memorial (with a plaque announcing this fact) and despite its remote location far from any government structures, under Lemon and Allegheny the cross violates the Establishment Clause merely because someone could reasonably perceive the cross as the City's endorsement of the Christian faith. The Supreme Court's recent decision in Capitol Square Review and Advisory Board v. Pinette, --- U.S. ----, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995), highlights the irony of this conclusion. In Pinette, the Court held that the state did not violate the Establishment Clause by permitting the Ku Klux Klan to erect a cross on the grounds of the state capitol. Id. As Justice Thomas noted, the Ku Klux Klan, by erecting a cross on public property "appropriated one of the most sacred of religious symbols as a symbol of hate." Id. at ---- - ----, 115 S.Ct. at 2450-51 (Thomas, J., concurring).
 
 
 41
 Ironically, the will of the majority of voters of Eugene, Oregon who approved use of the cross for a benign purpose must be overruled, while the Ku Klux Klan receives constitutional protection when it uses the cross as a message of hate. As judges of the inferior courts of the federal system, we do our best to resolve cases in the light of Supreme Court guidance. Alas, its instructions on implementation of the Establishment Clause are not always clear, consistent or coherent.
 
 
 
 *
 The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation
 
 
 [1]
 By separate published opinion filed today, we also decide the constitutionality, under the No Preference Clause of the California Constitution, of a 103-foot concrete and steel Latin cross owned and displayed by the City and County of San Francisco on Mount Davidson Park. Carpenter v. City and County of San Francisco, 93 F.3d 627 (9th Cir.1996)
 
 
 [2]
 As a threshold matter, we note that Separation is composed of local citizens who have standing to bring this challenge because they alleged that the cross prevented them from freely using the area on and around Skinner's Butte. See Ellis v. City of La Mesa, 990 F.2d 1518, 1523 (9th Cir.1993), cert. denied, 512 U.S. 1220, 114 S.Ct. 2707, 129 L.Ed.2d 834 (1994)
 
 
 [3]
 The First Amendment provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. Appellants' challenge is based upon the federal Constitution, not the Oregon Constitution; consequently, we have no reason to address Oregon constitutional issues
 
 
 [4]
 The idea of strict separation between church and state existed well before Thomas Jefferson wrote his famous January 2, 1802 letter to the Danbury Baptist Association in which he states that the "act of the whole American people which declared that their legislature should 'make no law respecting an establishment of religion, or prohibiting the free exercise thereof,' ... buil[t] a wall of separation between church and state." Leonard A. Levy, Jefferson and Civil Liberties 7-8 (1963). See also Everson v. Board of Education, 330 U.S. 1, 8-16, 67 S.Ct. 504, 507-12, 91 L.Ed. 711 (1947); Reynolds v. U.S., 98 U.S. 145, 163-164, 25 L.Ed. 244 (1878). In fact, in 1785, six years before the adoption of the Bill of Rights, Jefferson and his close friend, James Madison, led the fight in the Virginia legislature against a state tax for support of Virginia's established religion. Everson, 330 U.S. at 11-12, 67 S.Ct. at 509-10. Not only was the tax bill defeated, but the Virginia assembly passed the Act for Establishing Religious Freedom, which was drafted by Jefferson and pushed through the legislature by Madison. Id. at 12, 67 S.Ct. at 510 (citing 12 Hening, Statutes of Virginia (1923) 84). See also Levy, supra, at 7
 Thus, the Supreme Court has "recognized that the provisions of the First Amendment, in the drafting and adoption of which Madison and Jefferson played such leading roles, had the same objective and were intended to provide the same protection against governmental intrusion on religious liberty as the Virginia statute." Everson, 330 U.S. at 13, 67 S.Ct. at 510 (citations omitted). Further, Professor Leonard W. Levy, who has written extensively about Thomas Jefferson and the Establishment Clause, has observed: "The significance of the [Virginia] statute is not just that it broadened freedom of worship or of opinion in matters of religion but that it separated church and state in the context of protecting religious liberty." Leonard W. Levy, The Establishment Clause 68-69 (2d ed. rev. 1994).
 
 
 [5]
 The concurring opinion of Judge O'Scannlain conclusorily criticizes our legal analysis, yet, curiously, his opinion tracks with our analysis and reliance on the endorsement test of Allegheny County v. Greater Pittsburgh ACLU, 492 U.S. 573, 592, 109 S.Ct. 3086, 3100, 106 L.Ed.2d 472 (1989). Discussion of the views of the various Justices on the Lemon test is better resolved by that Court and serves no purpose here than to otherwise confuse a simple, straightforward issue
 Furthermore, we think the parties should take heed that this court cannot render advisory opinions on constitutional issues. To suggest there are various remedies to resolve a constitutional violation is best left to the parties, and if need be, further litigation. This court should not and cannot render constitutional approval on any future proposed suggested relief.
 
 
 [1]
 The "wall of separation" metaphor was taken from a letter that Thomas Jefferson wrote to the Danbury Baptist Association fourteen years after the framing of the Bill of Rights. Jefferson did not participate in the framing of the Establishment Clause as he was in France at the time the Bill of Rights was passed. Wallace, 472 U.S. at 92, 105 S.Ct. at 2508. The "wall of separation" metaphor's prominence in Establishment Clause jurisprudence is thus startling, given that, as then Justice Rehnquist has observed, Jefferson "would seem to any detached observer as a less than ideal source of contemporary history as to the meaning of the Religious Clauses of the First Amendment." Id. In the words of Professor Harold Berman: "[I]t must be concluded that the establishment clause of the first amendment, drafted not by the Deist Jefferson, but by the Protestant Christian James Madison, was not intended to prevent any government aid to religion but was intended rather to prevent the establishment of a national religion." Harold J. Berman, Religion and Law: The First Amendment in Historical Perspective, 35 Emory L.J. 777, 785 (1986). Moreover, Jefferson's own actions hardly evinced strict adherence to separation of church and state. In the 1780s, Jefferson supported a bill in the Virginia Legislature that would punish violators of the Christian Sabbath. See Leonard W. Levy, The Establishment Clause 69 (2d ed. rev. 1994). As President, Jefferson made a treaty with the Kaskasia Indians "providing for a salary to be paid by the United States government for a Catholic priest and for United States funding of the erection of a Catholic church." Berman, supra, at 785 (citing Treaty Between the United States of America and the Kaskasia Tribe of Indians, Aug. 13, 1803, art. III, 7 Stat. 79)
 
 
 [2]
 As Justice Story phrased it: "Probably at the time of the adoption of the Constitution, ... the general, if not universal sentiment in America was, that Christianity ought to receive encouragement from the State so far as was not incompatible with the private rights of conscience and the freedom of religious worship. An attempt to level all religions, and to make it a matter of state policy to hold all in utter indifference, would have created universal disapprobation, if not universal indignation." Joseph Story, Commentaries on the Constitution of the United States § 1874, at 593 (2d ed. 1851)
 
 
 [3]
 The following six states maintained or authorized established religions: Connecticut, Georgia, Maryland, Massachusetts, New Hampshire, and South Carolina. Daniel O. Conkle, Toward a General Theory of the Establishment Clause, 82 Nw. U.L.Rev. 1113, 1132 n. 97 (1988)
 
 
 [4]
 Justice Story's Commentaries on the Constitution also supports this understanding. In discussing the Establishment Clause Justice Story observed that due to, among other things, "the bigotry of spiritual pride, and the intolerance of sects, ... it was deemed advisable to exclude from the national government all power to act upon the subject.... Thus, the whole power over the subject of religion is left exclusively to the State governments, to be acted upon according to their own sense of justice and the State Constitutions." Joseph Story, Commentaries on the Constitution of the United States § 1879, at 596-97 (2d ed. 1851)
 
 
 [5]
 Nevertheless, the Court in Larson went on to find the statute unconstitutional under the Lemon test as well. See Larson, 456 U.S. at 251-55, 102 S.Ct. at 1686-89
 
 
 [6]
 Following the Supreme Court's lead, the courts of appeals continue to apply Lemon in cases involving religious displays on government property. See, e.g., Gonzales v. North Township of Lake County, Indiana, 4 F.3d 1412, 1419 (7th Cir.1993) (applying Lemon in case involving year-round crucifix in public park)
 
 
 [7]
 In an ironic twist, Justice Kennedy, in his dissent in Allegheny, cites Lowe v. Eugene, 254 Or. 518, 463 P.2d 360 (1969), cert. denied, 397 U.S. 1042, 90 S.Ct. 1366, 25 L.Ed.2d 654, reh'g denied, 398 U.S. 944, 90 S.Ct. 1838, 26 L.Ed.2d 283 (1970), in support of the proposition that the Establishment Clause "forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall." Allegheny, 492 U.S. at 661, 109 S.Ct. at 3137
 
 
 [8]
 The validity of Allegheny 's endorsement test in the context of private religious displays in the public forum has recently been called into question. See Capitol Square Review and Advisory Board v. Pinette, --- U.S. ----, ---- - ----, 115 S.Ct. 2440, 2447-50, 132 L.Ed.2d 650 (1995). No contention has been made that the Skinner's Butte cross is private religious speech; rather, we deal here with a government display of a religious symbol. See id. at ----, 115 S.Ct. at 2448 ("[T]here is a crucial difference between government speech endorsing religion, which the Establishment Clause forbids, and private speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." (quotation omitted))
 
 
 [9]
 Indeed, the Oregon Supreme Court expressly found that while the cross had originally been erected for a religious purpose, after 1970 the cross served the secular purpose of memorializing war veterans. Eugene Sand and Gravel, Inc. v. City of Eugene, 276 Or. 1007, 558 P.2d 338, 345 (1976), cert. denied, 434 U.S. 876, 98 S.Ct. 226, 54 L.Ed.2d 155 (1977). Further, in 1970 "an appropriate ceremony was conducted by the American Legion to dedicate the cross as the 'Veteran's War Memorial Monument.' " Id. 558 P.2d at 344. Memorial ceremonies were subsequently conducted by the American Legion at the site of the cross. Finally, although prior to 1970 the cross was illuminated only during the "religious festivals" of Christmas and Easter, the Oregon Supreme Court found it significant that after 1970 the cross has been illuminated on Thanksgiving, Memorial Day, Independence Day, and Veteran's Day as well as on Christmas. Id
 
 
 [10]
 The cross' effect should be analyzed from the standpoint of a reasonable observer. "[T]he reasonable observer in the endorsement inquiry must be deemed aware of the history and context of the community and forum in which the religious display appears." See Pinette, --- U.S. at ----, 115 S.Ct. at 2455 (O'Connor, J., concurring). As the City points out in its supplemental brief, a reasonable observer would not mistake the cross for an endorsement of Christianity. However, it must be acknowledged that a reasonable observer would understand that the cross is a government, not a private, display. It is this additional fact that brings the cross under Allegheny 's analysis
 
 
 [11]
 I do not subscribe to the notion that a constitutional violation results merely because the cross stands on a hill and thus is visible to many. Whether a religious display garners a great deal of attention or is scarcely noticed is irrelevant to the Establishment Clause. Rather, the Establishment Clause focuses on whether the religious display creates an appearance of governmental endorsement of religion. Thus, how few or how many people view the display does not advance the analysis
 
 
 [12]
 I hasten to note, however, that an important distinction can be drawn between a bare Latin cross, such as the one at issue here, and a crucifix (that is, a cross adorned with the figure of Jesus Christ). See Gonzales v. North Township of Lake County, Indiana, 4 F.3d 1412 (7th Cir.1993) (display of crucifix in public park violates the Establishment Clause). While a crucifix is an unmistakable symbol of Christianity, an unadorned Latin cross need not be. See Lynch v. Donnelly, 465 U.S. 668, 676, 104 S.Ct. 1355, 1360-61, 79 L.Ed.2d 604 (1984) (noting that the "National Gallery in Washington maintained with Government support, for example, has long exhibited masterpieces with religious messages, notably the Last Supper, and paintings depicting the Birth of Christ, the Crucifixion, and the Resurrection, among many others with explicit Christian themes and messages"). Indeed, the erection of a cross may be "a political act, not a Christian one." Pinette, --- U.S. at ----, 115 S.Ct. at 2450 (Thomas, J., concurring)
 
 
 [13]
 At oral argument in the other case in which an opinion was filed today involving a publicly-owned cross, Carpenter v. City and County of San Francisco, 93 F.3d 627 (9th Cir.1996), the attorney for the citizens challenging San Francisco's ownership of the Mount Davidson Cross made the welcome suggestion that the Cross could continue to stand if the land beneath it were rendered non-public