**Frank BUONO & Allen Schwartz, Plaintiffs,**

v.

**Gale NORTON, John Reynolds, & Mary Martin, Defendants.**

**No. EDCV01216RTSGLX.**

United States District Court, C.D. California, Western Division.

July 24, 2002.

Mark D. Rosenbaum, Peter J. Eliasberg, ACLU Foundation of Southern Cal., Los Angeles, CA, for plaintiffs.

Charles R. Shockey, AUSA Office of Atty. Gen., Environmental & Natural Resources Div., Sacramento, CA, for defendants.

ORDER 1) GRANTING PLAINTIFFS FRANK BUONO'S AND ALLEN SCHWARTZ'S MOTION FOR SUMMARY JUDGMENT; AND 2) DENYING DEFENDANTS GALE NORTON'S, JOHN REYNOLDS', AND MARY MARTIN'S MOTION FOR SUMMARY JUDGMENT

TIMLIN, District Judge.

The court, Judge Robert J. Timlin, has read and considered Plaintiffs Frank Buono ("Buono") and Allen Schwartz ("Schwartz") (collectively, "Plaintiffs")'s Motion for summary judgment pursuant to Federal Rules of Civil Procedure, Rule 56 ("Rule 56"); Defendants Gail Norton ("Norton"), John Reynolds ("Reynolds"), and Mary Martin ("Martin") (collectively, "the government"[1])'s opposition; and

---

1. The court will refer to Defendants as "the government" because Norton, Secretary of

Plaintiffs' reply. The court also has read and considered the government's Motion for summary judgment pursuant to Rule 56; Plaintiffs' opposition; and the government's reply. Based on such consideration, the court concludes as follows:

## I.

### BACKGROUND

Buono filed a Complaint for injunctive and declaratory relief on March 22, 2001, alleging that the government violated his rights under the Establishment Clause of the First Amendment to the United States Constitution. On October 26, 2001, a First Amended Complaint ("FAC") was filed, adding Schwartz as a co-Plaintiff. Both Plaintiffs and the government now move the court for summary judgment.[2]

## II.

### EVIDENTIARY OBJECTIONS

**A. Plaintiffs' Objections to Portion of Martin Declaration Dated March 12, 2002**

1. Paragraph 9—overruled.

**B. Plaintiffs' Objections to Portions of Buono Deposition Dated December 27, 2001**

1. Page 60, lines 10–12; page 61, lines 1–11, 15–20; page 66, lines 14–24, 17–20; page 80, lines 9–19; page 100, lines 8–23; page 101, lines 7–9; page 134, line 21 through page 135, line 1; page 173, lines 12–21—overruled.

2. Page 164, lines 21–25—sustained on the basis of relevance.[3]

3. Page 91, lines 1–9; page 92, lines 2–7, 8–17; page 93, lines 8–18; page 94, line 24 through page 96, line 3—sustained on the basis of relevance.

**C. Plaintiffs' Objections to Portions of Schwartz Deposition Dated December 18, 2001**

1. Page 21, lines 20–25—overruled

2. Page 37, lines 6–23; page 43, line 20 through page 44, line 9; page 46, lines 9–14; page 47, lines 16–19—sustained on the basis of relevance.

## III.

### UNCONTROVERTED MATERIAL FACTS

The following are uncontroverted material facts supported by admissible evidence.

A latin cross sits on federal land in the Preserve.

The Preserve is located in the Mojave Desert in southeastern California, between the cities of Barstow, California, and Las Vegas, Nevada. The Preserve lies almost entirely between Interstate 15 ("I–15") to the north and Interstate 40 to the south, starting approximately 60 miles east of Barstow and extending toward the California–Nevada boundary and U.S. Route 95.

The cross is located on federal land within the Preserve known as Sunrise

---

the United States Department of Interior, Reynolds, Regional Director of the Pacific West Region of the National Park Service ("NPS"), and Martin, Superintendent of the Mojave National Preserve ("Preserve"), are sued in their official capacities. The court notes that Reynolds was erroneously sued as the Regional Director of the Pacific West Region of the Department of the Interior.

**2.** Because simultaneous cross-motions for summary judgment on the same claim are before the court, the court has considered the appropriate evidentiary material identified and submitted in support of both motions and in opposition to both motions before ruling on each of them.

**3.** The court notes that page 164, lines 21–25 does not establish Buono's current residence.

Rock, approximately 11 miles south of Interstate 15.

Before Congress designated the area as a national preserve, the United States Bureau of Land Management ("BLM"), the NPS's sister agency within the United States Department of Interior ("DOI"), had managed much of the federal desert land, including the area surrounding Sunrise Rock.

The Preserve is now operated by the NPS, a division of the DOI and a federal agency.

The Preserve encompasses approximately 1.6 million acres, or 2500 square miles, of primarily federally owned land in the Mojave Desert. The BLM, another federal agency, transferred the land to the NPS in 1994 as a result of the California Desert Protection Act.

Following the creation of the Preserve in 1994, Marvin Jensen ("Jensen") was appointed as the Preserve's first Superintendent. Buono at that time worked for the NPS and was assigned to the Preserve from January 22, 1995, to December 10, 1995, serving as an Assistant Superintendent for Ecosystem Management. Martin, the Deputy Superintendent, succeeded Jensen as Superintendent in 1995. In 1995, Buono left the Preserve and took a similar position with the NPS at the Joshua Tree National Park. Buono retired from public service in 1997, although he remains active and interested in NPS activities.

Approximately 86,600 acres of private land remain within the Preserve's boundaries. Another 43,000 acres belong to the State of California.

The cross is mounted on the top of a prominent rock outcropping on the north side of Cima Road, a narrow blacktop secondary road that passes through the Preserve.

The cross is visible to vehicles traveling on the road from a distance of approximately 100 yards.

A latin cross has two arms, one horizontal and one vertical, at right angles to each other, with the horizontal arm being shorter than the vertical arm.

The latin cross is the preeminent symbol of Christianity. It is exclusively a Christian symbol, and not a symbol of any other religion.

The cross is between five and eight feet tall, and it is bolted into the rock.

The cross is constructed out of four inch diameter metal pipes that are painted white.

The cross was erected in 1934, 60 years before Congress created the Preserve, by the Veterans of Foreign Wars as a memorial to veterans who died in World War I. Photos show the presence of wooden signs near the cross stating, "The Cross, Erected in Memory of the Dead of All Wars," and "Erected 1934 by Members Veterans of Foregin [sic] Wars, Death Valley Post 2884." The wooden signs are no longer present, and the original cross, which is no longer standing, has been replaced several times by private parties since 1934.

There is currently no plaque at the cross indicating that it was intended to act as a memorial for soldiers.

The cross has been a gathering place for Easter Sunrise services since as early as 1935. Visitors to the Preserve also use the site to camp.

The NPS has not opened up the area of Sunrise Rock to individuals to erect other free-standing permanent displays, religious or otherwise, and there are no other free-standing displays, religious or otherwise, in the area.

The controversy surrounding the cross surfaced in 1999, when the NPS received a

letter from an individual who identified himself as "Sherpa San Harold Horpa" of Jensen, Utah. The person who sent the letter under the alias "Sherpa San Harold Horpa" is also known to Buono as Herman R. Hoops ("Hoops"), a retired NPS employee and long-time acquaintance of Buono. Hoops requested permission from the NPS to erect a "stupa" (a dome-shaped Buddhist shrine) on a rock outcrop at a trail head located near the cross.

In a May 27, 1999, letter, the NPS informed Hoops that agency regulations codified at 36 C.F.R. § 2.62(a) would prohibit Hoops from installing a religious symbol, such as a stupa. The NPS noted that it intended to remove the cross located at that site.

On October 6, 1999, the American Civil Liberties Union ("ACLU") sent the NPS a letter expressing concern about the cross and threatened legal action if the NPS did not remove the cross.

After receiving the ACLU's October 6, 1999, letter, Martin directed the NPS staff to study the history of the cross. On January 31, 2000, the NPS completed an evaluation of the cross for commemorative significance, and concluded that the cross did not qualify for inclusion in the National Register of Historic Places.

The NPS was informed during contacts with local citizens that immediately removing the cross could lead to significant public opposition. The NPS had encountered considerable public opposition to earlier decisions to remove privately-owned items interfering with its management of the Preserve.

On August 3, 2000, the ACLU wrote to NPS Director Robert Stanton and asserted that the cross on federal land violated the United States Constitution and that the ACLU would sue the NPS within 60 days unless the NPS removed the cross. The ACLU letter stated: "If we do go forward with a lawsuit, a court not only would order the government to remove the cross, but it also likely would assess damages against those responsible government officials who knew about the cross and yet did nothing about it [in] the face of the clear constitutional commands that make its presence on government property illegal."

Martin distributed a memorandum to her staff on October 6, 2000, informing it of her decision to remove the cross, citing her concern over the threatened private damage claim. After receiving the ACLU letters, the NPS located the private individuals believed to be responsible for maintaining the cross. Martin met with them and discussed the possibility of their voluntarily removing the cross. The individuals expressed their unwillingness to remove the cross and their determination to replace the cross if it were taken down.

On October 20, 2000, Reynolds wrote to inform the ACLU that the NPS intended to remove the cross.

San Bernardino County Supervisor Kathy A. Davis wrote to Congressman Jerry Lewis ("Lewis") (R–CA) on November 2, 2000, protesting the removal of the "veteran's memorial." In response to an inquiry from Lewis, Reynolds informed Lewis of the NPS's decision to remove the cross. NPS did not immediately remove the cross.

On December 15, 2000, the United States Congress passed an appropriations bill, the Consolidated Appropriations Act, a provision of which provided that none of the appropriated federal government's funds may be used to remove the cross. Then–President Clinton signed the law on December 21, 2000. The NPS did not act to remove the cross due to the legislative spending ban.

In December 2001 Congress passed PL 107–117, the Department of Defense and

Emergency Supplemental Appropriations for Recovery From and Response to Terrorist Attacks on the United States Act, a provision of which designated the cross as a national memorial commemorating United States participation in World War I. The law provides funds to install a memorial plaque at the foot of the cross.

Buono worked for the NPS from 1972 to 1997. Buono was the Assistant Superintendent of the Preserve from September 1994 until December 1995. He held the same title at the Joshua Tree National Park until his retirement.

Buono became aware of the cross in 1995, when as the then-Assistant Superintendent of the Preserve, he was driving on Cima Road and "saw the cross on the small granite outcropping to which it is affixed."

Buono has never observed any sign, plaque, or indication of religious services performed at Sunrise Rock. He observed the cross perched on a rock off the highway from a distance of several hundred feet. He described the area surrounding the cross as a natural desert environment, with the only visible signs of human activity from Sunrise Rock being off-road vehicle tracks and a parking area for trail hikers, but with no buildings, telephone poles, or power lines in view.

He has no knowledge of anything the NPS has done to erect, maintain, or sponsor the cross, nor is he aware of any permit issued by the NPS or BLM regarding the cross.

Buono was actively involved in the designation of the Preserve as a national park area and its transfer from the control of the BLM to the NPS.

He regularly consulted with employees at the NPS legislative affairs office, wrote position papers, and sponsored a panel discussion in an effort to have the Califor-

nia Desert Protection legislation enacted into law.

Buono has remained actively involved in the Preserve since he moved from the area and since his retirement from the NPS.

Although he now lives in Oregon, Buono regularly visits the Preserve. Since leaving the NPS he has visited the Preserve two to four times a year on average.

Because of his continuing concern with the Preserve, Buono maintains regular contact with a wide variety of persons and groups located in or involved with the Preserve, including the National Audubon Society, National Parks Association, Southwest Center for Biological Diversity, Citizens for Mojave National Park, and the Public Employees for Environmental Responsibility.

Buono next intends to visit the Preserve in the Spring of 2002.

In 2002, Buono also intends to sell his home in Oregon, to relocate to Southern California or Arizona, and to make more frequent trips to the Preserve.

Buono is deeply offended by the cross display on public land in an area that is not open to others to put up whatever symbols they choose. A practicing Roman Catholic, Buono does not find a cross itself objectionable, but stated that the presence of the cross is objectionable to him as a religious symbol because it rests on federal land.

Buono will tend to avoid Sunrise Rock on his visits to the Preserve as long as the cross remains standing, even though traveling down Cima Road is often the most convenient means of access to the Preserve.

The NPS has no record of a complaint by Buono concerning the cross during his NPS career. Buono never mentioned or objected to the cross in discussions with

any fellow employee of the NPS during his tenure as Assistant Superintendent of the Preserve. At no time did he ever discuss the legality of the cross with his agency's legal adviser. Buono submitted written comments to the Preserve on its draft General Management Plan in 1998, after he was aware of the cross, but he did not address or object to the cross. After he left the NPS, Buono spoke once about the cross with the Preserve's Chief Ranger, Sean McGuinness, in November 2000.

Schwartz is a many times decorated Jewish veteran of the United States Armed Forces.

He joined the Air National Guard in 1953 and was on active duty in the Air Force from 1956 until 1978.

Schwartz served in a variety of places, including March Air Force Base in California, as well as in Korea and in Vietnam from January 1967 through January 1968.

Schwartz is a member of a wide variety of veterans' organizations.

He is the Quartermaster of Post 152 of the Jewish War Veterans, Commander of Post 6476 of the Veterans of Foreign Wars ("VFW"), and Chaplain of American Legion Post 155.

Schwartz lives in Rialto in San Bernardino County, California, approximately three hours' drive from the cross.

Schwartz has lived for the past 23 years in San Bernardino County, the same county that encompasses the Preserve and the cross, and was unaware of its existence until September 2001, when a fellow veteran mentioned it at a VFW Post meeting and the chairman of the "action committee" asked him to "check out" the cross. He never had any occasion to visit the Preserve or view the cross until he decided to become a plaintiff in this action. He is not offended or injured by the sight of the cross, only by the fact that the land on which it rests is federally owned.

Schwartz first visited the cross in October 2001, while taking a side excursion en route to Las Vegas. He saw no sign directing him to the location of the cross, and does not recall any markings indicating who owned the surrounding land, other than his vague recollection of a sign that he was entering the Preserve. He has no personal knowledge of whether and which portions of the land within the boundaries of the Preserve are owned by the United States, the State of California, or private citizens. Schwartz has no personal knowledge of whether or not the land on which the cross is situated is federal.

He first observed the cross from his car at a distance of approximately 50 feet while driving south on Cima Road from Interstate 15. After driving past the cross and turning around, he saw the cross driving back north from a "very short distance," estimated at 20 feet.

Schwartz observed that the rock on which the cross is located is 15 to 20 feet in height. Schwartz climbed to within 10 feet from the cross, which he described as made of four-inch white painted pipe, and approximately six feet in height. He enjoyed "extremely clear" visibility of at least a mile from atop the rock, but observed no other signs of human habitation or buildings, just the paved road, rock, weeds, and probably some cactus. Schwartz saw no evidence at the cross of any lights, plaques, signs, or religious worship (besides the cross itself). He also knows of no NPS activity in the area, including maintenance or sponsorship of the cross.

Schwartz is offended by the presence of the cross on federal land because he does not believe that the United States should permit sectarian religious symbols on government property unless the property is open to all to erect other symbols or displays.

His further reaction to the cross itself is that it is "very nice to have put it up there whoever did it," and the sole basis for his objection is its presence on federal land.

At the time Schwartz climbed up near the cross, there were no plaques or other signs stating that the cross is intended to be a veterans' memorial.

Even if such signs were there, the cross would offend Schwartz, because a sectarian Christian symbol is not meaningful to him as a Jewish war veteran.

The presence of the cross negatively affects Schwartz' enjoyment of the area as he passes through it.

Schwartz intends to visit the cross area regularly during his trips to Las Vegas because he finds the presence of the cross on government land offensive. He will go to see if it has been taken down.

Schwartz never contacted the NPS to express any concern or objection regarding the cross.

Norton is the Secretary of the DOI. As Secretary of the DOI, she oversees the NPS.

Reynolds is the Regional Director of the Pacific West Region of the NPS. The Preserve is within the Pacific West Region of the NPS.

Martin is the Superintendent of the Preserve.

## IV.

### ANALYSIS

#### A. Legal Standard Governing Motion For Summary Judgment

Under Rule 56(c), a district court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c).

The Supreme Court and the Ninth Circuit have established the following standards for consideration of such motions: "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrates the absence of any genuine issue of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (quoting Rule 56(e) and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103–04 (9th Cir.1986)). With respect to these specific facts offered by the non-moving party, the court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party. *See T.W. Elec. Serv.*, 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Rule 56(c) nevertheless requires this Court to enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient: "[T]here must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *see also Matsushita*, 475 U.S. at 586, 106

S.Ct. at 1355–56 ("[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). This court thus applies to either party's motion for summary judgment the same standard as that for a motion for a directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *T.W. Elec. Serv.*, 809 F.2d at 630.

## B. Plaintiffs' and the Government's Motions

The court concludes that the evidence as presented by both Plaintiffs and the government does not establish any triable issues of material fact. Consequently the court will consider and decide under the uncontroverted material facts (1) whether Buono and Schwartz have standing to assert their constitutional claims, and (2) if either or both of them has standing as a matter of law, whether the presence of the cross on federally owned land in the Preserve violates the Establishment Clause of the First Amendment to the United States Constitution.

### 1. *Standing*

Article III of the United States Constitution limits federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2; *see also, e.g., Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 2135–36, 119 L.Ed.2d 351 (1992). Standing, or "whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues," *ASARCO Inc. v. Kadish*, 490 U.S. 605, 612–13, 109 S.Ct. 2037, 2043, 104 L.Ed.2d 696 (1989) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)), is therefore a matter of constitutional dimension.

Plaintiff must satisfy three requirements in order to establish Article III standing. First, plaintiff "must demonstrate 'injury in fact'—a harm that is both 'concrete' and 'actual or imminent, not conjectural or hypothetical.'" *Vermont Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771, 120 S.Ct. 1858, 1861, 146 L.Ed.2d 836 (2000) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 1723, 109 L.Ed.2d 135 (1990) (internal quotation marks and citation omitted)). Second, she "must establish causation—a 'fairly ... trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant." *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41, 96 S.Ct. 1917, 1926, 48 L.Ed.2d 450 (1976)). Third, she "must demonstrate redressability—a 'substantial likelihood' that the requested relief will remedy the alleged injury in fact." *Id.* at 771, 120 S.Ct. at 1861–62 (quoting *Simon*, 426 U.S. at 45, 96 S.Ct. at 1928).

The government does not contest that Buono and Schwartz satisfy the redressability prong because part of the relief, namely, ordering the government to remove the cross, would remedy the alleged injury in fact. Therefore, the court will address the government's contentions that Buono and Schwartz have not demonstrated injury in fact and causation.

### a. Injury in fact

To allege an injury in fact, plaintiff must show "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. In the Establishment Clause context, injury in fact exists if plaintiff was "subjected to unwelcome religious exercises or [was] forced to assume special burdens to avoid them." *Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc.*, 454 U.S. 464, 486 n. 22, 102

S.Ct. 752, 766 n. 22, 70 L.Ed.2d 700 (1982). *See also, e.g., Arizona Civil Liberties Union v. Dunham,* 112 F.Supp.2d 927, 929 (D.Ariz.2000) (quoting *American Civil Liberties Union v. Rabun County Chamber of Commerce, Inc.,* 698 F.2d 1098, 1108 (11th Cir.1983) (quoting in turn *Valley Forge,* 454 U.S. at 487 n. 22, 102 S.Ct. at 766 n. 22)).

With respect to being "subjected to unwelcome religious exercises," "religious exercises" can include "religious displays":

> Religious display cases are an even more particularized subclass of Establishment Clause standing jurisprudence. The injury that gives standing to plaintiffs in these cases is that caused by unwelcome direct contact with a religious display that appears to be endorsed by the state. Applying *Valley Forge,* many lower courts have thus premised standing on the injury that results from unwelcome personal contact with a state-sponsored religious display.

*Suhre v. Haywood County,* 131 F.3d 1083, 1086–87 (4th Cir.1997) (citing *Murray v. City of Austin,* 947 F.2d 147, 151 (5th Cir.1991); *Kaplan v. City of Burlington,* 891 F.2d 1024, 1027 (2d Cir.1989); *Foremaster v. City of St. George,* 882 F.2d 1485, 1490–91 (10th Cir.1989); *Saladin v. City of Milledgeville,* 812 F.2d 687, 692 (11th Cir.1987); *Harvey v. Cobb County,* 811 F.Supp. 669, 675 (N.D.Ga.), *aff'd,* 15 F.3d 1097 (11th Cir.1994)). There is no question based on the uncontroverted facts that both Buono and Schwartz were harmed by being subjected to an unwelcome religious display, namely the cross. Each Plaintiff came into a direct and unwelcome contact with the cross. Each was offended by its presence, and each will continue to be offended by its presence on subsequent, imminent trips by them to or near the site of the cross.

■ With regard to the second disjunctive element for standing in Establishment Clause cases—being forced to assume burdens to avoid government-endorsed religion—the government contends that Plaintiffs' exposure to the cross should be disregarded for purposes of standing because Plaintiffs could have avoided the harm. However, the Seventh Circuit has expressly rejected such an argument, and the court adopts its reasoning. In *American Civil Liberties Union v. City of St. Charles,* 794 F.2d 265 (7th Cir.1986) (Posner, J.), the Seventh Circuit responded to defendant's contention that "plaintiffs have inflicted this cost on themselves and can avoid it by continuing to follow their accustomed routes and shrugging off the presence of the ... cross." 794 F.2d at 268. The court held "[t]hat the injury to the plaintiffs could have been averted ... did not deprive the plaintiffs of standing," commenting that "[i]f [they] lacked standing ... no one would have standing." *Id.* at 268–69. By the government's logic, all individuals offended by a religious display could avoid it and thereby not be harmed by it. Such an argument flies in the face of standing jurisprudence and would render the Establishment Clause a nullity.

In the same vein, the government claims that Buono's and Schwartz's standing is as tenuous as that of plaintiffs in *Bear Lodge Multiple Use Ass'n v. Babbitt,* 175 F.3d 814 (10th Cir.1999), because plaintiffs' standing here, as in *Bear Lodge,* is based on plaintiffs' "coming to the injury." The *Bear Lodge* plaintiffs challenged, inter alia, the constitutionality of the government's request that plaintiffs refrain from rock climbing in a certain area. *See id.* at 820–22. Finding that plaintiffs did not have standing, the court focused on the fact that plaintiffs' compliance with the request was voluntary. *See id.* at 821–22. However, Plaintiffs' standing here is not premised on conduct pursuant to the same precatory request as that of the *Bear Lodge* plaintiffs. The cross will remain on the federal

land, continuing to harm Buono and Schwartz when they are in or near the area, unless and until the court orders it removed.

■ The fact that Schwartz initially proactively sought to find the cross is also irrelevant. Standing sufficient to warrant the imposition of prospective injunctive relief is not based on Schwartz's previous visits to the Preserve, but rather on such future visits. While the fact that he intends to visit the cross regularly *"because he finds the presence of the cross . . . offensive"* might not establish an injury in fact, *see Valley Forge*, 454 U.S. at 487, 102 S.Ct. at 766 (commenting that plaintiff may not "roam the country in search of governmental wrongdoing" in order to gain standing), Schwartz also asserts that his "enjoyment of the area" will be lessened due to the presence of the cross when he passes through the Preserve in the future for reasons other than checking on the status of the cross. Such harm constitutes injury in fact.[4] In other words, the court concludes that both Plaintiffs have incurred an actual and particularized concrete injury, not a generalized grievance, by the existence of the cross as located in the Preserve.

In sum, the Ninth Circuit has held repeatedly that plaintiffs who are prevented from freely using public land due to a religious symbol being located thereon have suffered an injury in fact. *See, e.g., Separation of Church and State Comm. v. City of Eugene*, 93 F.3d 617, 619 n. 2 (9th Cir.1996) (per curiam) ("SCSC"); *Ellis v. City of La Mesa*, 990 F.2d 1518, 1523 (9th Cir.1993); *Hewitt v. Joyner*, 940 F.2d 1561, 1564 (9th Cir.1991). Here, as a result of the presence of the cross, Buono, who regularly visits the Preserve, will avoid traveling on Cima Road, which is often the most convenient means of access to the Preserve. Schwartz, who also plans on passing through the Preserve, is unable to enjoy the area fully due to the presence of the cross. The presence of the cross clearly prevents them from freely using public land.

In the case most analogous to the situation at bar, *SCSC*, the Ninth Circuit made short thrift of defendant City of Eugene's standing arguments. Ruling on the constitutionality of a latin cross situated in a public park, the Ninth Circuit disposed of a challenge to plaintiff's standing in a footnote: "As a threshold matter, we note that [plaintiff organization] is composed of local citizens who have standing to bring this challenge because they alleged that the cross prevented them from freely using the area." *SCSC*, 93 F.2d at 619 n. 2.[5]

---

**4.** The uncontroverted material facts are silent with respect to whether Schwartz will see the cross when he "passes through" the area in the future. However, neither Buono nor Schwartz actually needs to see the cross in order to be injured by its presence. *Compare Books v. City of Elkhart*, 235 F.3d 292, 297 (7th Cir.2000) (finding that plaintiffs have standing, even though their injury was based, at least in part, on the fact that they "know the [religious symbol] is there whether [they] see it or not"). It is sufficient for purposes of standing that Plaintiffs know that the cross will remain until the government removes it, which knowledge will negatively affect their enjoyment of the area as they pass through the Preserve.

**5.** The government seeks to distinguish the *SCSC* court's discussion of standing because the cross in *SCSC* was larger and otherwise more prominent than the cross here. Even if this were the case, the court is nonplussed how the size and prominence of a cross in any way affects whether plaintiffs, who had direct contact with the cross, and who were and will continue to be injured by its presence, have standing. *Compare Rabun*, 698 F.2d at 1108 (commenting that "the Supreme Court has made it clear that no minimum quantitative limit is required to establish injury [in fact]").

Here, Buono will not travel on Cima Road and Schwartz cannot enjoy his travels through the Preserve due to the presence of the cross. This is sufficient to constitute injury in fact. *Compare City of St. Charles,* 794 F.2d at 268 (holding that plaintiffs have standing to assert Establishment Clause violation because, in part, a cross "led [plaintiffs] to alter their behavior").[6]

### b. Causation

■ The government contends that the uncontroverted facts do not establish as a matter of law a fairly traceable connection between the injury in fact to Plaintiffs and the alleged conduct of the government. It argues that private individuals erected and maintained the cross, and that the government has taken no affirmative action to support the religious symbol. However, as Plaintiffs point out, the government has taken and will continue to take affirmative action in support of the cross, and, in any event, governmental affirmative action is not necessary to establish causation for the purpose of standing in Establishment Clause cases.

First, the government has and will continue to support maintaining the cross. Citing an administrative regulation, the NPS refused Hoops' request to erect another religious display in the same area of the Preserve as the cross. In its letter denying the request, the NPS advised Hoops that it intended to remove the cross.[7] However, recent federal legislation banning the NPS from spending money to remove the cross precludes it from doing so. Moreover, the NPS, pursuant to federal law, plans to install a memorial plaque at the base of the cross. The first governmental action—refusing the installation of another religious symbol, while permitting the presence of the cross—constitutes governmental support for the cross; the second—spending money and installing a plaque at the site of the cross, while prohibiting the NPS from using appropriated

---

**6.** The government raises three issues with respect to Plaintiffs' injury in fact, or lack thereof, that have yet to be addressed by the court, none of which warrants more than brief mention. First, in an argument that the government quixotically both advances and concedes as baseless, the government claims that Plaintiffs have not suffered an injury in fact because their contact with the cross is for a very short period of time. However, any viewing of an allegedly unconstitutional religious symbol, no matter how brief, is significant, and the government cites no judicial authority to the contrary. Second, the government argues that the presence of the cross does not impede Plaintiffs' enjoyment of "nearly all" of the 1.6 million acres of the Preserve. This is a similarly unavailing argument. *See, e.g., Gonzales,* 4 F.3d at 1417 (one cross on 336 acres of public park did not negate plaintiffs' standing because "denial of even a portion of the Park is an injury in fact"). *See also Valley Forge,* 454 U.S. at 486 n. 22, 102 S.Ct. at 766 n. 22 (plaintiff has standing in Establishment Clause action when she alleges that she must assume burdens to avoid a religious symbol).

Third, the government makes much of the fact that neither Buono nor Schwartz complained about the presence of the cross prior to their filing the present action. Judicial precedent does not support Defendants' implied contention that the lack of pre-trial complaints about the alleged unconstitutionality of a religious symbol should factor into standing analysis. Courts in similar situations have held that plaintiffs have standing without questioning their lack of pre-trial complaints. *See, e.g., Books,* 235 F.3d at 296–97 (plaintiffs who had lived in close proximity to allegedly unconstitutional religious symbol for decades had standing, notwithstanding that there was no evidence that they had complained about the presence of the symbol prior or to their filing the complaint).

**7.** The government appears to argue that one reason it did not remove the cross was Martin's apprehension that doing so would have subjected her to physical abuse from local citizens. While the court is sympathetic to Martin's concern for her well-being, the court finds it irrelevant to the issue of Plaintiffs' standing.

money to remove the cross—constitutes both governmental support for and maintenance of the cross. These affirmative actions provide a "fairly traceable connection" between the injury in fact and the government's conduct. *See Desert Outdoor Adver. v. City of Moreno Valley*, 103 F.3d 814, 818 (9th Cir.1996).

■ Second, a showing of affirmative action by the government is not required to establish the causation element of standing in order to challenge the constitutionality of a religious display on government land when the government has not opened up the area to other religious displays. Numerous courts have held that plaintiffs have standing to challenge the constitutionality of religious symbols neither erected nor maintained by the government. *See, e.g., Books*, 235 F.3d at 295–301 (holding that plaintiffs have standing to challenge the constitutionality of monument inscribed with the Ten Commandments placed on government land by private organization, even though government did not maintain the structure); *Gonzales v. N. Township*, 4 F.3d 1412, 1414–17 (7th Cir.1993) (holding that plaintiffs have standing to challenge the constitutionality of the presence of a cross in a city park, even though the cross was neither erected nor financially maintained by the government). While the court concludes from the uncontroverted facts that the federal government did and will take affirmative action in support of maintaining the cross, establishing a certain traceable connection between the injury in fact and the government's conduct, the mere presence of the cross on federal land is sufficient to satisfy the causation prong.

While, in general, "the concept of injury for standing purposes is particularly elusive in Establishment Clause cases," *Murray*, 947 F.2d at 151, this is not such a case. The court concludes as a matter of law that both Buono and Schwartz have standing to challenge the constitutionality of the government's maintaining the presence of the cross under the Establishment Clause. The court now will consider the constitutionality of the presence of the cross in the Preserve.

### 2. Constitutionality of the Presence of the Latin Cross

The Establishment Clause of the First Amendment to the United States Constitution states that "Congress shall make no law respecting an establishment of religion ...." U.S. Const. amend. 1. According to the Supreme Court, "the Establishment Clause [has come] to mean that government may not promote or affiliate itself with any religious doctrine or organization ...." *County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U.S. 573, 590–91, 109 S.Ct. 3086, 3099–3100, 106 L.Ed.2d 472 (1989).

> Whatever else the Establishment Clause may mean (and we have held it to mean no official preference even for religion over nonreligion, see, *e.g., Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989)), it certainly means at the very least that government may not demonstrate a preference for one particular sect or creed (including a preference for Christianity over other religions). "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244, 102 S.Ct. 1673, 1683, 72 L.Ed.2d 33 (1982).

*Id.* at 605, 109 S.Ct. at 3107.

The parties agree that the Supreme Court's ruling in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), sets forth the governing test to evaluate an alleged Establishment Clause violation. *See also Alvarado v. City of San Jose*, 94 F.3d 1223, 1231 (9th Cir.1996) (noting that "the *Lemon* test is the one

applied in this circuit") (citing *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1378 (9th Cir.1994); *Kreisner v. San Diego*, 1 F.3d 775, 780 (9th Cir.1993)). A government religious practice or symbol will survive an Establishment Clause challenge when it (1) has a secular purpose, (2) has a primary effect that neither advances nor inhibits religion, and (3) does not foster excessive state entanglement with religion. *See Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111. "State action violates the Establishment Clause if it fails to satisfy any of these prongs." *Edwards v. Aguillard*, 482 U.S. 578, 583, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987); *see also Vernon v. City of Los Angeles*, 27 F.3d 1385, 1397 (9th Cir.1994) (citing *Edwards* ).

The government maintains that its actions satisfy all of *Lemon*'s test elements, while Plaintiffs contend that the government has run afoul of both the purpose and effect prongs. The court need not assess whether the purpose prong is violated because the primary effect of the presence of the cross advances religion.

The effect prong "asks whether, irrespective of government's actual purpose, the practice ... in fact conveys a message of endorsement or disapproval [of religion]." *Lynch v. Donnelly*, 465 U.S. 668, 690, 104 S.Ct. 1355, 1368, 79 L.Ed.2d 604 (O'Connor, J., concurring). With regard to whether the presence of the cross has a primary effect that advances or inhibits religion, or conveys a message of governmental endorsement or disapproval of religion, the court is bound by *SCSC*, which, in applying the effect prong, concluded that the presence of a particular cross on government land violated the Establishment Clause. The *SCSC* court, faced with facts materially indistinguishable from those in the action at bar, assessed the constitutionality of a latin cross that was erected by private individuals. *See id.* at 618. These individuals deeded the cross to the City of Eugene, which placed a plaque "at the foot of the cross dedicat[ing] it as a memorial to war veterans." *Id.* Every year, the City of Eugene illuminated the cross for seven days during the Christmas season, five days during the Thanksgiving season, and one day each on Memorial Day, Independence Day, and Veteran's Day. *See id.*

The Ninth Circuit concluded that it was "simple" and "straightforward" that the presence of the cross had a primary effect that advanced religion, and thus was unconstitutional. *Id.* at 620 n. 5. Finding that "[t]here is no question that the Latin cross is a symbol of Christianity," and that "the cross may reasonably be perceived as governmental endorsement of Christianity," the court held that "its placement on public land by the City of Eugene violates the Establishment Clause." *Id.* at 620 (concluding that "the City of Eugene has impermissibly breached the First Amendment's 'wall of separation' between church and state"). This is notwithstanding the fact that the cross served officially as a war memorial. *See id.* at 618–19.[8]

---

**8.** Many other courts have similarly held that a religious symbol's official designation as a war memorial does not shield it from constitutional scrutiny. *See, e.g., Gonzales*, 4 F.3d at 1421 (*"Lemon* does not permit a municipality to exempt a[sic] obviously religious symbol from constitutional strictures by attaching a sign dedicating the symbol to our honored dead."); *Jewish War Veterans of U.S. v. United States*, 695 F.Supp. 3, 14 (D.D.C.1988) ("The use of a cross as a memorial to fallen or missing servicemen is a use of what to some is a religious symbol where a nonreligious one likely would have done as well. The Court is constrained to find that cross cannot satisfy the secular effect prong of the *Lemon* test because it conveys a message of endorsement of Christianity."); *Greater Houston Chapter of American Civil Liberties Union v. Eckels*, 589 F.Supp. 222, 235 (S.D.Tex.1984) ("[E]ven if one strains to view the symbols in the context of a war memorial, their primary effect is to give the impression that only

Defendants attempt to distinguish *SCSC* on two bases: First, that the cross in *SCSC* was much more noticeable than the cross at bar. Second, that the government is significantly less intertwined with the cross here than in *SCSC*. *Compare Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 337, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273 (1987) ("For a law to have forbidden 'effects' under *Lemon*, it must be fair to say that the *government itself* has advanced religion through its own activities and influence.") (emphasis in original). However, neither distinction is apt.

While it is true that the *SCSC* cross, unlike the cross at bar, was large (51 feet tall), illuminated at night, and located in a relatively populous city, these characteristics are largely inapposite factors to Establishment Clause analysis. While the "particular physical setting" is a relevant consideration in assessing whether the presence of a religious symbol violates the Establishment Clause, *see, e.g., Allegheny*, 492 U.S. at 597, 109 S.Ct. at 3103, nothing in *SCSC* suggests that the particular setting of the cross in question militates in favor of finding its presence meets the primary effect standard. Quite the opposite: the cross is on federal land, and the court concludes from the uncontroverted material facts that a reasonable observer would believe that such land and the cross are owned by the government. *See Allegheny*, 492 U.S. at 620, 109 S.Ct. at 3115 (whether primary effect advances or inhibits religion is to be assessed according to the standard of a "reasonable observer"). *Compare SCSC*, 93 F.3d at 626 (O'Scannlain, J., concurring) (rejecting defendant's argument that the cross is constitutional because it "stands so remote from any government buildings").

Christians and Jews are being honored by the

■ Furthermore, the court concludes that the size of a cross and the number of people who view it are not important for deciding whether a reasonable observer would perceive the cross located on federal land as governmental endorsement or disapproval of religion. *Compare Books*, 235 F.3d at 296 (religious symbol that is six feet tall and three-and-a-half feet wide was unconstitutional); *American Civil Liberties Union of Ohio v. City of Stow*, 29 F.Supp.2d 845, 847 (N.D.Ohio 1998) (holding unconstitutional a city seal, which was displayed on, inter alia, official City stationary and letterhead, because the upper-left quadrant depicted an open book, overlaid with a cross). Similarly, the constitutionality of the presence of a religious symbol does not depend on the number of people who view the symbol. It is sufficient that Plaintiffs have been and will continue to be harmed by the presence of the cross. *Compare SCSC*, 93 F.3d at 625–26 n. 11 (O'Scannlain, J., concurring):

> I do not subscribe to the notion that a constitutional violation results merely because the cross ... is visible to many. Whether a religious display garners a great deal of attention or is scarcely noticed is irrelevant to the Establishment Clause. Rather, the Establishment Clause focuses on whether the religious display creates an appearance of governmental endorsement of religion. Thus, how few or how many people view the display does not advance the analysis.

With respect to the government's attempt to distinguish *SCSC* on the ground that the government in *SCSC* was more intertwined with the cross than is the government as to the subject cross, this contention lacks merit. It is true that in *SCSC*, unlike in the present situation, the City of Eugene granted a permit (post-

county.").

erection) to the individuals who erected the cross, and then accepted a deed to the cross. *See* 93 F.3d at 618. In addition, the City of Eugene illuminated the cross fifteen days annually. *See id.* However, as discussed above, the uncontroverted facts are that the government is intimately connected to the cross. *See supra* Section B.1.b.[9]

■ Here, as in *SCSC*, the presence of the cross on federal land conveys a message of endorsement of religion. Thus, the court concludes as a matter of law based on the uncontroverted facts that the presence of the cross on the federal land portion of the Preserve is unconstitutional, and the court will grant Plaintiffs' Motion for summary judgment and deny the government's Motion for summary judgment.[10]

## V.

### DISPOSITION

ACCORDINGLY, IT IS ORDERED THAT:

1) Plaintiffs' Motion for summary judgment is GRANTED; and

2) the government's Motion for summary judgment is DENIED.

9. In so finding, the court notes that it is not engaging in an analysis pursuant to the third *Lemon* prong-excessive state entanglement with religion. Rather, it is merely responding to the government's attempts to distinguish *SCSC*.

10. To the extent that the government contends that the court should not rule on the constitutionality of the presence of the cross due to the plenary power doctrine, *see* U.S. Const. art. IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States . . . ."), its argument is unsupportable. In essence, the government asks this court to hold that the plenary power doctrine as embodied in the Property Clause trumps all constitutional provisions. This po-

sition is both contrary to law and bad policy. First, "Congress has plenary authority in all areas in which it has substantive legislative jurisdiction *so long as the exercise of that authority does not offend some other constitutional restriction." Buckley v. Valeo,* 424 U.S. 1, 132, 96 S.Ct. 612, 688, 46 L.Ed.2d 659 (1976) (per curiam) (internal citation omitted) (emphasis added). Moreover, under the government's argument, Congress could pass and the President could sign legislation that allows discrimination on the basis of race or gender, or that permit the restriction of speech, so long as such conduct occurs on federal land. However, the legislative and executive branches' exercise of their constitutional powers continues to be subject to compliance with the Establishment Clause of the First Amendment, one of the oldest Amendments to the United States Constitution.