**F I L E D**
United States Court of Appeals
Tenth Circuit

APR 26 1999

**PATRICK FISHER**
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

BEAR LODGE MULTIPLE USE
ASSOCIATION, A Wyoming Non-profit
Corporation; ANDY PETEFISH, doing
business as Tower Guides; KENNETH D.
ALLEN; GARY W. ANDERSON;
GREGORY HAUBER; WES BUSH,

    Plaintiffs - Appellants,

v.

BRUCE BABBITT, in his official
capacity as United States Department of
the Interior Secretary; ROGER G.
KENNEDY, in his official capacity as
Director of the National Park Service;
JOHN E. COOK, in his official capacity
as Rocky Mountain Regional Director,
National Park Service; DEBORAH O.
LIGGETT, in her official capacity as
Superintendent of Devil's Tower National
Monument; NATIONAL PARK
SERVICE,

    Defendants - Appellees,

CHEYENNE RIVER SIOUX TRIBE;
ROMANUS BEAR STOPS; BURDELL
BLUE ARM; ARVOL LOOKING
HORSE; STEVEN VANCE,

    Defendants-Intervenors -
    Appellees,

No. 98-8021

GROUP OF CONCERNED SCHOLARS; MEDICINE WHEEL COALITION ON SACRED SITES OF NORTH AMERICA, NORTHERN ARAPAHO TRIBE, SISSETON-WAHPETON SIOUX TRIBE, UPPER SIOUX INDIAN COMMUNITY; NATIONAL CONGRESS OF AMERICAN INDIANS; THE BAPTIST JOINT COMMITTEE ON PUBLIC AFFAIRS; THE BECKET FUND FOR RELIGIOUS LIBERTY; BUREAU OF CATHOLIC INDIAN MISSIONS; CLIFTON KIRKPATRICK, AS STATED CLERK OF THE GENERAL ASSEMBLY; THE PRESBYTERIAN CHURCH (U.S.A.); ENRIGHT BIGHORN, AS STATED CLERK OF THE DAKOTA PRESBYTERY IN THE SYNOD OF LAKES & PRAIRIES AND THE PRESBYTERIAN CHURCH (U.S.A.); THE EVANGELICAL LUTHERAN CHURCH IN AMERICA; FRIENDS COMMITTEE ON NATIONAL LEGISLATION; GENERAL CONFERENCE OF SEVENTH-DAY ADVENTISTS; NATIONAL JEWISH COMMISSION ON LAW AND PUBLIC AFFAIRS; PRISON FELLOWSHIP MINISTRIES; UNION OF AMERICAN HEBREW CONGREGATIONS; UNION OF ORTHODOX JEWISH CONGREGATIONS OF AMERICA,

      Amici Curiae.

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. No. 96-CV-063-D)**

William Perry Pendley, (Todd S. Welch, with him on the briefs), Mountain States Legal Foundation, Denver, Colorado, for Plaintiffs-Appellants.

Jared A. Goldstein, United States Department of Justice, Environmental & Natural Resources Division (Lois J. Schiffer, Assistant Attorney General; John A. Bryson, United States Department of Justice, Environmental & Natural Resources Division, with him on the briefs), Washington, D.C.; for Defendants-Appellees.

Steven J. Gunn, Indian Law Resource Center (Steven C. Emery and Thomas J. Van Norman, Cheyenne River Sioux Tribe, Eagle Butte, South Dakota, with him on the brief), Washington, D.C., for Defendants-Intervenors-Appellees.

Peter G. Griffin, Jacobson, Buffalo, Schoessler & Magnuson, LTD., Minneapolis, Minnesota: Jack F. Trope, Sant'Angelo and Trope, P.C., Cranford, New Jersey: Steven C. Moore and Walter R. Echo-Hawk, Native American Rights Fund, Boulder, Colorado: Kevin J. Hasson and Eric W. Treene, The Becket Fund for Religious Liberty, Washington, D.C., for Amici Curiae.

Before **PORFILIO**, **MCKAY,** and **TACHA**, Circuit Judges.

**PORFILIO**, Circuit Judge.

Devils Tower is a National Monument, as well as the place of creation and religious practice for many American Indians. Rock climbers use the Tower for recreational and commercial climbing ascents. Over the past 30 years rock climbing on Devils Tower has dramatically increased, affecting the environment and the spiritual life

and practices of Americans Indians.  To address the various concerns, the National Park

Service (NPS) developed a Final Climbing Management Plan for Devils Tower National

Monument (FCMP).  In addition to providing educational and environmental programs,

the FCMP asks that climbers voluntarily refrain from climbing during the month of June

when American Indians engage in the Sun Dance and other ceremonies.  The Secretary of

the Interior (Secretary) approved the plan.  Bear Lodge Municipal Use Association and

other climbers (Climbers)[1] challenged  the Secretary's approval, arguing the FCMP

violates the Establishment Clause.  The district court found the FCMP balanced the

competing interests and observed the Constitution, and was therefore within Secretarial

discretion in managing Devils Tower National Monument.  Our jurisdiction arises

pursuant to 28 U.S.C. § 1291. We believe the Climbers alleged no injury and, therefore,

lacked standing to sue.


## I.

The Devils Tower National Monument, a 600-foot butte, is located in northeastern

Wyoming.  The FCMP reports that Devils Tower[2] is a "sacred site" to indigenous peoples

---

[1]Plaintiffs-appellants (Climbers) include:  Bear Lodge Multiple Use Association, an organization whose stated objectives are to develop management goals for natural resources and to maintain public access to the sites; Andy Petefish, the owner of a commercial guiding service at Devils Tower; and three long-time recreational climbers of Devils Tower.

[2]Devils Tower is referred to by many American Indians as "*Mato Tipila*" which
(continued...)

of the northern plains who travel to the monument to perform "traditional cultural activities."  Devils Tower is also eligible for inclusion to the National Register of Historic Places as a traditional cultural property.  In recent years, the Tower has been increasingly used by recreational and commercial rock climbers.  Devils Tower, therefore, implicates interests of several American Indian tribes, rock climbers, and the National Park Service.

*American Indians at Devils Tower*

The Intervenors Cheyenne River Sioux Tribe, et al., and members of numerous other Indian tribes have long viewed Devils Tower as a sacred site of special religious and cultural significance.  The NPS explains, "archaeological evidence has revealed that the ancestors to the Lakota people inhabited the Devils Tower area as far back as 1000 A.D., while ancestors to the Shoshone people inhabited the area in the 1500's."  The historical use of Devils Tower and surrounding areas by Lakota people was acknowledged by the Fort Laramie Treaty of 1868.   Amici Concerned Scholars state, "Devils Tower is central to [the Indians'] etiological explanation of the universe."  The most sacred religious artifact of the Sioux people is the White Buffalo Calf Pipe, given to them by White Buffalo Calf Woman at the beginning of creation when she emerged from Devils Tower.  The Tower is prominent in other religiously relevant traditional stories of the Sioux, as well as in the cosmology of numerous other northern plains tribes.

---

[2](...continued)
means "Bear Lodge" in Lakota, or "*He Hota Paha*," which means "Grey Horn Butte" in Lakota.  It is also called "Bear's Tipi" in Arapahoe, "Bear's House" in Crow, and "Tree Rock" in Kiowa.

According to Intervenor Romanus Bear Stops, a traditional spiritual leader of the Cheyenne River Sioux Tribe, Devils Tower is also a pilgrimage site where important liturgical functions are performed. At Devils Tower, Indian people[3] partake in Sun Dances and individual Vision Quests. The Sun Dance is a group ceremony of fasting and sacrifice which leads to spiritual renewal of the individual and group as a whole. Sun Dances are performed around the summer solstice. Vision Quests are intense periods of prayer, fasting, sweat lodge purification, and solitude designed to connect with the spiritual world and gain insight. Sun Dances and Vision Quests, as well as individualized prayer offerings and sweat lodge ceremonies, require solemnity and solitude.

The district court did not question the sincerity of the religious practices at Devils Tower. Intervenors explain these traditional religious uses of the Tower are:

> vital to the health of our nation and to our self-determination as a Tribe. Those who use the butte to pray become stronger. They gain sacred knowledge from the spirits that helps us to preserve our Lakota culture and way of life. They become leaders. Without their knowledge and leadership, we cannot continue to determine our destiny.

Amici Concerned Scholars state "as with most cultural groups, traditional religious practice[s] are essential to maintaining a stable and healthy community for Indian people."

---

[3] In addition to the Intervenor Cheyenne River Sioux Tribe, the Arapahoe, Crow, Kiowa, Lakota (Sioux), and Wind River (Easter Shoshone) tribes historically occupied the Devils Tower region, dating back before Wyoming was established as a territory or Devils Tower became a National Monument.

*Federal Policy on Indian Religious Worship*

As the various amici inform us, past federal policy was to assimilate American Indians into United States culture, in part by deliberately suppressing, and even destroying, traditional tribal religions and culture in the 19th and early 20th centuries. The government provided direct and indirect support to Christian missionaries who sought to convert and civilize the Indians, and "from the 1890's to 1930's, the government moved beyond promoting voluntary abandonment of tribal religions to, in some instances, affirmatively prohibiting those religions." Jack F. Trope, *Protecting Native American Religious Freedom: The Legal, Historical, and Constitutional Basis for the Proposed Native American Free Exercise of Religion Act*, 20 N.Y.U. Rev. L. & Soc. Change 373, 374 (1993).[4] By the late 19th Century federal attempts to replace traditional Indian religions with Christianity grew violent. In 1890 for example, the United States Calvary shot and killed 300 unarmed Sioux men, women and children en route to an Indian religious ceremony called the Ghost Dance; these included individuals from the Intervenors' tribe. In 1892, Congress outlawed the practice of traditional Indian religious

---

[4]As early as 1818, the United States contracted with Christian missionary societies to organize and run boarding schools which enrolled Indian students, either voluntarily or by force. *See* Francis E. Leupp, Former Commissioner of Indian Affairs, THE INDIAN AND HIS PROBLEM, 138 (1971 ed., originally printed in 1910). Consistent with President Grant's "Peace Policy," religious orders were given general administrative control of reservations in the 1870's. *See, e.g.*, Annual Report of the Commissioner of Indian Affairs (November 1, 1872) (listing reservation assignments to various religious orders).

rituals on reservation land. Engaging in the Sun Dance, one of the ceremonies at issue in this case, was punishable by withholding 10 days' rations or 10 days' imprisonment. *See* H. Exec. Doc. No. 1 part 5, vol. II, 53 Cong., 2d Sess., at 28-31, reprinted Francis Paul Prucha, S.J., AMERICANIZATION OF THE AMERICAN INDIAN: WRITINGS FROM THE FRIENDS OF THE INDIANS 1880-1900 (1973), 300-05.[5] This and other laws disrupted and harmed Indian practices, but many, including the Sun Dance and others at issue in this case, survived.

Starting in the 1930's federal policy toward Indians changed, and over the past 65 years, has valued and protected tribal governments and cultures. In 1978, Congress enacted the American Indian Religious Freedom Act creating a government-wide policy to protect Indian sacred sites and traditional forms of worship. *See* 42 U.S.C. § 1996 (1994). In 1990, Congress passed the Native American Graves and Repatriation Act (NAGPRA) requiring federal land managers, including the NPS, to protect Indian graves, consult with Indian tribes concerning religious and cultural sites and objects, and to repatriate cultural and religious items found on federal lands. *See* 25 U.S.C. § 3001 (1995). Under the National Historical Preservation Act Amendments of 1992, "properties of traditional religious and cultural importance to an Indian tribe … may be determined eligible for inclusion on the National Register" and federal agencies, including the NPS

---

[5]*See also*, Dept. of the Interior, Regulations of the Indian Office 106 (1894) (prohibiting the Sun Dance).

are directed to consult "with any tribe … that attaches religious and cultural significance to [such] properties." 16 U.S.C. § 470a(d)(6)(A)-(B) (1985 & 1998 Supp.)  The federal government acknowledges that site specific worship is vital to Indian religious practices. Recently the executive branch has ordered federal agencies to: (1) accommodate access to and ceremonial use of Indian sacred sites by Indian religious practitioners and (2) avoid aversely affecting the physical integrity of such sacred sites.  *See* Exec. Order 13007, 61 Fed. Reg. 26771 (1996).  Numerous other laws generally protect Indian religion and allow access to and/or temporary closure of specific tribal sacred sites located on federal lands.[6]

*Climbers at Devils Tower*

The Climbers explain "climbing on Devils Tower is recognized by the NPS 'as a legitimate recreational and historic activity.'"  There is evidence of climbing on the Tower as far back as 1893, and the first "technical climb" occurred in 1937.  Climbing at Devils Tower accounted for 1.3% of the annual visitations to the Monument for the years 1989 to 1995, and climbing in the month of June constituted 0.25% of the annual

---

[6]***See, e.g.***, 16 U.S.C. § 460uu-47 (1993 & 1998 Supp.) (authorizing access to and temporary closures of El Malpais National Monument for traditional cultural and religious purposes); 16 U.S.C. § 410pp-6 (1992 & 1998 Supp.) (authorizing temporary closures of Cibola Historical Park for Indian religious services); 16 U.S.C. § 228i(c) (1992) (preserving access to Grand Canyon National Park for Indian religious purposes); 16 U.S.C. § 41011-4 (1992) (preserving access to federal park lands or archaeological sites for traditional Indian religious purposes); 25 U.S.C. §§ 640d-20 (1995) (providing the Navajo and Hopi tribes with rights to use and access sacred sites).

visitation for those same years.  According to the Climbers, from 1989 through 1994,

June has been the most popular month for climbing Devils Tower.  The FCMP reported:

> Recreational climbing at Devils Tower has increased dramatically from 312 climbers in 1973 to over 6,000 annually.  New route development in the last ten years resulted [in] accelerated route development and bolt placement.  Today the tower has about 220 named routes.  Approximately 600 metal bolts are currently embedded in the rock along with several hundred metal pitons.  Devils Tower is world famous for its crack climbing, which depends primarily on removable protection placed by climbers in cracks.
>
> Activities performed by the numerous climbers on the tower during the spring through fall climbing season have affected nesting raptors, soil, vegetation, the integrity of the rock, the area's natural quiet, and the rock's physical appearance.  Some American Indians have complained that the presence of climbers on the sacred butte and the placement of bolts in the rock has adversely impacted their traditional activities and seriously impaired the spiritual quality of the site.

(FCMP at iii).  In addition to placing permanent and temporary metal "protection" in the

rock, climbing requires climbers to yell certain commands to their partners.  Climbers

have also taken pictures of Native Americans in ceremonies, removed sacred prayer

bundles, and intruded on solitude.

The Climbers acknowledge that "privacy is considered essential . . .for many of the

religious practices of some American Indians, including Vision Quests, the leaving of

prayer offerings, sweatlodge rites, [and] the Sun Dance."  However, their brief describes:

> In a survey performed in June and July of 1992 by a group independent of the NPS, climbers were asked specifically if their "views of climbing would change if they knew that Native Americans considered it a sacred site and objected to climbing."  Sixty-seven (67) percent said their view of climbing would not change out of respect for the religious beliefs of some Native Americans and "that they would continue to climb the tower."

The Climbers also contend "climber-watching" is a favorite activity of numerous visitors to Devils Tower. All of the individual named plaintiffs in this case continue to climb at Devils Tower.

*National Park Service Plan*

In 1906, President Roosevelt established Devils Tower and the 1300-acre area surrounding it as the first national monument. ***See*** Presidential Proclamation No. 658, 34 Stat. 3236 (Sept. 24, 1906). Since 1916, Devils Tower has been under the management of the National Park Service, an agency of the Department of the Interior. Under its governing statute, NPS must protect the values for which Devils Tower National Monument was established. ***See*** 16 U.S.C. 1a-1 (1988).[7] In its appellate brief, NPS explains one of the primary bases for the Tower's designation as a National Monument is "the prominent role it has played in the cultures of several American Indian tribes of the North Plains. "

Recognizing that increasing climbing activity[8] affects the environment as well as "the ability of American Indians to engage in their ceremonial activities in peace," NPS began preparing a draft climbing management plan in 1992. Its objectives were to

---

[7]President Roosevelt declared the Tower is "a natural wonder and an object of historic and great scientific interest … [and] warning is hereby given to all unauthorized persons not to appropriate, injure, or destroy any feature of the natural tower." Presidential Proclamation No. 458, 34 Stat. 3236, 3237 (Sept. 24, 1906).

[8]In 1994, the NPS counted 6,035 climbers on Devils Tower. NPS indicated the total recreational users of Devils Tower number nearly half a million per year, of which climbers constitute 1.3%.

"manag[e] climbing so as to preserve and protect the monument's natural and cultural resources, and to increase visitor awareness of American Indian beliefs and traditional practices at Devils Tower." With the assistance of environmentalists, county officials, climbers, and representatives of American Indian communities, NPS issued a draft climbing management plan in July 1994, and made available 1200 copies to interested parties. A public comment period lasted until the end of October 1994, during which NPS received nearly 300 written comments, and also recorded oral comments at six public meetings held around the region. The NPS issued the "Final Climbing Management Plan / Finding of No Significant Impact for Devils Tower National Monument" in February 1995. The FCMP "sets a new direction for managing climbing activity at the Tower for the next three to five years." FCMP at i. Its purpose is "to protect the natural and cultural resources of Devils Tower and to provide for visitor enjoyment and appreciation of this unique feature." *Id.* To protect against any new physical impacts to the Tower, the FCMP provides that no new bolts or fixed pitons will be permitted on the Tower, and new face routes requiring new bolt installation will not be permitted. *Id.* at 24-25. The FCMP does allow individuals to replace already existing bolts and fixed pitons. *Id.* at 25. In addition, the plan calls for access trails to be rehabilitated and maintained, and requires camouflaged climbing equipment, and climbing routes to be closed seasonally to protect raptor nests. *Id.* at 24-29. The FCMP further provides that "[i]n respect for the reverence many American Indians hold for

Devils Tower as a sacred site, rock climbers will be asked to voluntarily refrain from climbing on Devils Tower during the culturally significant month of June." *Id.* at i.

The NPS represents it will rely on climbers' self-regulation and a new educational program "to motivate climbers and other park visitors to comply" with the FCMP. *Id.* at 22. The NPS has also placed a sign encouraging visitors to stay on the trail surrounding the Tower.[9] The FCMP provides for evaluation of the plan after three to five years. Factors indicating an unsuccessful voluntary closure would include little to no decrease in the number of climbers, an increase in the number of unregistered climbers, and increased conflict between user groups in the park. *Id.* at 23. The voluntary closure will be "fully successful when every climber personally chooses not to climb at Devils Tower during June out of respect for American Indian cultural values." *Id*. However, the FCMP recognizes, "the value of a voluntary closure is that individuals can make a personal choice about climbing. Climbers can regulate themselves by deciding if they want to refrain from June climbing out of respect for American Indian cultural values." *Id.* at 22.

If NPS determines that voluntary June closure and the educational programs have not been successful, it will consider several actions, including, but not limited to:

> (a) revise the climbing management plan; (b) reconvene a climbing management plan work group; (c) institute additional measures to further encourage compliance; (d) change the duration and nature of the voluntary

---

[9]The sign is posted by the NPS at the base of the Tower and reads, "The Tower is sacred to American Indians. Please stay on the trail."

closure; (e) convert the June closure to mandatory; (f) write a new definition of success for the voluntary closure.

*Id.* at 23.

The NPS plans to comply with its June closure by not allowing NPS staff to climb on the Tower in June except to enforce laws and regulations or to perform emergency operations. Originally, the plan also contained a provision stating that commercial use licenses for climbing guide activities would not be issued by the NPS for the month of June. *Id.* at 22. The Climbers filed a motion to enjoin NPS from imposing the ban on commercial climbing during the month of June. The district court granted the motion in June 1996. In December of that year, the Secretary issued a decision revoking the commercial climbing ban.

Although the FCMP no longer calls for a ban on commercial climbing in the month June, the Climbers argue that the Secretary wrongfully contends he has the power to impose such a rule. Other provisions objected to by the Climbers remain in the plan. These include the voluntary ban on climbing in June; an interpretive education program which explains the religious and cultural significance that the Monument has among some American Indians; and finally, the placement of signs which encourage people to remain on the trail surrounding the Tower.

## II.

Before the district court, the Climbers challenged the Secretary's approval of the FCMP, arguing the FCMP violated the Establishment Clause. The district court decided on the merits that the Secretary's approval of the NPS plan was "a lawful and legitimate exercise of [his] authority ... carefully crafted to balance the competing needs of individuals using Devil's Tower … while … obeying the edicts of the Constitution."[10] On appeal, the Climbers again raise their Establishment Clause claim, and the Secretary responds the Climbers lack standing to sue. The Secretary points out:

> FCMP has not caused any injury to Bear Lodge or its members because they remain free to climb Devils Tower any time they choose, including during June.… Indeed, while many climbers have chosen not to climb during the month of June out of respect for American Indian use of the site, appellants Andy Petefish, Gary Anderson, Kenneth Allen, Gregory Hauber, and Wes Bush have continued to climb in June.

Nonetheless, the Climbers contend even if *they* have climbed, other members of the Bear Lodge Multiple Use Association have been "coerced by the ban into refraining from climbing. Thus even if the named plaintiffs were found to lack standing, other Association members suffer the injury in fact necessary to confer standing on the association itself."[11]

---

[10]We are not, as the Climbers erroneously argue, reviewing a grant of summary judgment in favor of the Secretary. If the standing issue did not preclude us from doing so, we would review *de novo* the district court's decision the Secretary acted within his discretion in accordance with the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706. *See Public Lands Council v. Babbit*,154 F.3d 1160, 1166 (10th Cir. 1998).

[11]Apparently, the Climbers have abandoned their argument, totally rejected by the district court, that the interpretive program and sign injured school children visiting the

(continued...)

The United States Supreme Court articulated the standing requirements in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992). In that case, several environmental organizations dedicated to wildlife conservation and other environmental causes, sought to challenge the Secretary of the Interior's reinterpretation of section 7(a)(2) of the Endangered Species Act, 16 U.S.C. § 1536. The Court outlined the three essential elements necessary to establish standing:

> First, the plaintiff must have suffered an "injury in fact"–an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id.* at 560-61 (internal quotations and citations omitted). The party invoking federal jurisdiction bears the burden of establishing these elements and of coming forward with evidence of specific facts which prove standing. *Id.* at 561.

Establishing injury in fact requires "a factual showing of perceptible harm." *Id.* at 566 (quoting *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688, 93 S. Ct. 2405, 2416 (1973)); *see also Department of Commerce v. United States House of Representatives*, ___ U.S. ___, 119 S. Ct. 765, 766-67 (1999) (To establish standing, a plaintiff must allege personal injury which is fairly traceable to

---

[11](...continued)
Monument, thereby conferring standing on the Climbers.

defendants' allegedly unlawful conduct, and which is likely to be redressed by the requested relief.).  We have held, "to satisfy Article III's case or controversy requirement, a litigant in federal court is required to establish its *own* injury in fact."  ***National Council for Improved Health v. Shalala***, 122 F.3d 878, 882 (10th Cir. 1997) (emphasis added).  Although a given action may cause harm to third persons, "a litigant may invoke only its own constitutional rights and may not assert rights of others not before the court."  ***Id.***

The named individual recreational climbers whose climbing activities have been undeterred by the FCMP have established no injury in fact and therefore do not have standing.  Further, the district court found commercial climbing guide Andy Petefish did not substantiate his claim of economic injury as a result of the voluntary closure, and he has provided no additional substantiation here.  Even if other Bear Lodge members have elected not to climb in June, that decision is one of several choices available under the plan and is not an injury conferring standing.  As the district court held, the possibility of mandatory closure is a "remote and speculative possibility," and is just one of many possibilities FCMP will consider if the present plan proves unsuccessful.  The Climbers' fear of an outright climbing ban in June does not satisfy the constitutional requirement for an injury in fact, which must be "actual or imminent not conjectural or hypothetical."  ***Bennett v. Spear***, ___ U.S. ___, 117 S. Ct. 1154, 1163 (1997).

In short, the Climbers "claim that the Constitution has been violated, [but] they claim nothing else. They fail to identify any personal injury suffered by them as a

consequence of the alleged constitutional error." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485, 102 S. Ct. 752, 765 (1982).  The Climbers are clearly incensed by the NPS' request that they voluntarily limit their climbing, but

> standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy.  That concrete adverseness which sharpens the presentation of issues, is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself.

*Id.* at 486, 102 S. Ct. at 766 (internal quotations and citations omitted).  Because they have alleged no injury as a result of their claim the FCMP improperly establishes religion, we hold the Climbers have no standing to sue in this case.

## III.

We believe the Climbers' lack of standing is dispositive.  Therefore, we do not reach either the Climbers' argument the FCMP establishes religion or the Secretary's response that the plan was designed, in part, to eliminate barriers to American Indians' free practice of religion and such accommodation is appropriate in situations like this where the impediments arise because the sacred place of worship is found on property of the United States.

**AFFIRMED.**