**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**September 19, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UTAH SHARED ACCESS ALLIANCE,
a Utah non-profit corporation,

        Plaintiff - Appellant,

    v.

GLENN CARPENTER, in his capacity as
manager of the Salt Lake Field Office of
the Bureau of Land Management;
MAGGIE WYATT, in her capacity as
manager of the Moab Field Office of the
Bureau of Land Management; SHERWIN
SANDBERG, in his capacity as manager
of the Monticello Field Office of the
Bureau of Land Management; JERRY
MEREDITH, in his capacity as manager
of the Richfield Field Office of the Bureau
of Land Management; SALLY WISELY,
in her capacity as Utah State Director of
the Bureau of Land Management; GALE
A. NORTON,  in her capacity as
Secretary of the Department of Interior;
BUREAU OF LAND MANAGEMENT;
KATHLEEN CLARKE, in her capacity
as director of the Bureau of Land
Management,

        Defendants - Appellees,

SOUTHERN UTAH WILDERNESS
ALLIANCE, a Utah non-profit
corporation; THE WILDERNESS
SOCIETY; WILDLANDS CPR, a
non-profit corporation; GREAT OLD

No. 05-4009

BROADS FOR WILDERNESS, a
non-profit corporation; REDROCK
FORESTS, a Utah non-profit corporation,

Defendants-Intervenors -
Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D. Ct. No. 2:01-CV-804-BSJ)**

---

Paul W. Mortensen, Hanks & Mortensen, P.C., Salt Lake City, Utah, appearing for the Plaintiff-Appellant.

Jeffrey E. Nelson, Assistant United States Attorney (Paul M. Warner, United States Attorney, with him on the brief), Office of the United States Attorney for the District of Utah, Salt Lake City, Utah, appearing for Defendants-Appellees.

Eric G. Biber, Earthjustice, Denver, Colorado (James S. Angell, Earthjustice, Denver, Colorado; Stephen H.M. Bloch, and Heidi J. McIntosh, Southern Utah Wilderness Alliance, Salt Lake City, Utah, with him on the brief), appearing for the Defendants-Intervenors-Appellees.

---

Before **TACHA**, Chief Circuit Judge, **McWILLIAMS**, Senior Circuit Judge, and **O'BRIEN**, Circuit Judge.

---

**TACHA**, Chief Circuit Judge.

Plaintiff-Appellant Utah Shared Access Alliance ("USA-ALL") is Utah's largest motorized access advocacy organization. Its members use motorized vehicles, including off-highway or off-road vehicles ("ORVs"), to access lands throughout Utah that are

managed by the Bureau of Land Management ("BLM"). After the BLM imposed several restrictions on ORV use in certain parts of the state, USA-ALL filed this lawsuit in the District of Utah under the Administrative Procedure Act ("APA"), alleging violations of the Federal Land Policy and Management Act ("FLPMA"), the National Environmental Policy Act ("NEPA"), the Federal Advisory Committee Act ("FACA"), and the National Defense Authorization Act ("NDAA"), as well as regulations promulgated pursuant to those statutes. The District Court concluded that the BLM had not violated FLPMA, NEPA, or FACA, and that USA-ALL did not have standing to bring its claim under the NDAA. The court therefore entered judgment in favor of the BLM and dismissed the action under the NDAA. USA-ALL now timely appeals the District Court's ruling with respect to FLPMA, NEPA, the NDAA, and certain regulations. We take jurisdiction under 28 U.S.C. § 1291 and AFFIRM.

## I. STATUTORY FRAMEWORK

A.     Federal Land Policy and Management Act

Nearly one-half of Utah is federal land managed by the BLM, which is an agency within the Department of Interior. *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 58 (2004) ("*SUWA*"). FLPMA, codified at 43 U.S.C. § 1701 *et seq.*, creates a "versatile framework" for governing the BLM's management of these lands. *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 737–38 (10th Cir. 1982). The statute directs the BLM to manage public lands "under principles of multiple use and sustained yield." 43 U.S.C. § 1732(a); *see also* 43 U.S.C. §1701(a)(8) (listing purposes and values that should

be considered in the management of public lands). "'Multiple use management' is a deceptively simple term that describes the enormously complicated task of striking a balance among the many competing uses to which land can be put . . . ." *SUWA*, 542 U.S. at 58 (citing 43 U.S.C. § 1702(c)). These uses include, but are not limited to, "recreation range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values.'" *Id.* The phrase "sustained yield" refers to the BLM's duty "to control depleting uses over time, so as to ensure a high level of valuable uses in the future." *Id.* (citing 43 U.S.C. § 1702(h)).

To assist in the management of public lands, FLPMA requires that the BLM "develop, maintain, and, when appropriate, revise land use plans." 43 U.S.C. § 1712(a). These land use plans, which the BLM regulations denote "resource management plans" ("RMPs"), *see* 43 C.F.R. § 1601.0-5(n) (2005), project both the present and future use of the land. 43 U.S.C. § 1701(a)(2). Proposed RMPs are subject to a mandatory period of public notice and comment, *see* 43 C.F.R. § 1610.2, and, once adopted, will "guide and control future management actions and the development of subsequent, more detailed and limited scope plans for resources and uses." 43 C.F.R. § 1601.0-2.

FLPMA prohibits the BLM from taking actions inconsistent with the provisions of RMPs. *See SUWA*, 542 U.S. at 69; 43 U.S.C. § 1732(a) ("The Secretary shall manage the public lands . . . in accordance with the land use plans developed by him . . . ."); 43 C.F.R. § 1610.5-3 ("All future resource management authorizations and actions . . . shall conform to the approved plan."). When needed, however, these plans may be amended.

-4-

43 C.F.R. § 1610.5-5. To do so, the BLM must prepare an environmental assessment or an environmental impact statement, *see id.*, and submit the proposed amendment to public notice and comment in the same way as when the plan was originally being prepared. 43 C.F.R. § 1610.2.

In any event, RMPs must further the purpose of FLPMA, which is to ensure that:

the public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8). Further underscoring the BLM's duty to protect the environment is the statutory requirement that "[i]n managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b).

B.     Executive Orders and Federal Regulations Pertaining to ORV Use

ORV use represents one of the multiple uses that the BLM provides for and must balance in managing the public lands. In response to increased ORV use on these lands, in 1972 President Nixon issued an executive order for the purpose of "establish[ing] policies and provid[ing] procedures that will ensure that the use of off-road vehicles on public lands will be controlled and directed so as to protect the resources of those lands, to promote the safety of all users of those lands, and to minimize conflicts among the various uses of those lands." Exec. Order No. 11644, 37 Fed. Reg. 2877 (Feb. 8, 1972).

The stated reason for the order was to further the purpose and policy of NEPA; it established criteria by which federal agencies were to develop regulations and administrative instructions for the designation of areas and trails on which ORVs would be permitted. *Id.* § 3. It also required agencies to "monitor the effects" of ORV use on the public lands and "[o]n the basis of the information gathered, they shall from time to time amend or rescind designations of areas or other actions taken pursuant to this order as necessary to further the [NEPA]." *Id.* § 8.

President Carter, in 1977, issued Executive Order No. 11989, which amended Executive Order 11644 and strengthened it considerably. *See* Exec. Order 11989, 42 Fed. Reg. 26959 (May 24, 1977). The amended order provides that notwithstanding the BLM's designations of public land use under the applicable RMP, the BLM "shall . . . immediately close" any area or route to ORVs whenever it determines that ORV use "will cause or is causing considerable adverse effects" to wildlife, wildlife habitat, and other natural resources. *See id.* § 2 (amending Exec. Order 11644, § 9(a)). Under the order, the closure must remain in place until the adverse effects have been eliminated. *Id.*

The Department of Interior has adopted regulations to implement the Nixon and Carter Executive Orders, FLPMA, and other federal statutes. *See* 43 C.F.R. § 8340.0-1 *et seq*. Under 43 C.F.R. § 8342.1, all public lands must be designated as open, limited, or closed to off-road vehicles. *See* 43 C.F.R. § 8342.1. The designations must be made to minimize conflicts among the different users of the lands (i.e., hikers, ORV users, and birdwatchers). *Id.* In addition, care must be taken to avoid damage to natural resources

and to prevent impairment of wilderness suitability. *Id.* The initial designation of areas as open, limited, or closed to ORVs is accomplished through the resource management planning process, and it must involve public participation and consideration of all viewpoints. 43 C.F.R. § 8342.2(a).

Short of promulgating or amending an RMP, the resource management planning process does not speak to the manner in which an ORV designation may be changed. As such, and in order to address Executive Order 11989, the BLM promulgated a regulation that requires the agency to close areas to ORV use, without resort to the route-designation process undertaken when promulgating or amending an RMP, when the BLM determines that ORVs "are causing or will cause considerable adverse effects" to "soil, vegetation, wildlife, wildlife habitat, cultural resources, historical resources, threatened or endangered species, wilderness suitability, other authorized uses, or other resources." 43 C.F.R. § 8341.2(a). Notably, such closures are nondiscretionary: the BLM "*shall immediately close* the areas affected to the type(s) of vehicle causing the adverse effect until the adverse effects are eliminated and measures implemented to prevent recurrence." *Id.* (emphasis added). "This provision creates a separate duty to close without regard to the designation process; it does not automatically become inoperative once the Secretary exercises his discretion to designate the land." *Sierra Club v. Clark*, 756 F.2d 686, 690 (9th Cir. 1985).

The BLM's authority to close or restrict the use of public lands notwithstanding the provisions of the governing RMP is not limited to 43 C.F.R. § 8341.2(a). It is also

permitted to do so in order "to protect persons, property, and public lands and resources." 43 C.F.R. § 8364.1. An order closing or restricting the use of public lands under this authority must identify the lands that are closed to entry or restricted as to use; specify the uses that are restricted; specify the period of time during which the closure or restriction applies; identify any persons exempt from the closure or restriction; include a statement of the reasons for the closure; and be posted and published as provided in the regulation. 43 C.F.R. § 8364.1(b), (c).

C.     National Environmental Protection Act

NEPA, 42 U.S.C. § 4321 *et seq.*, was enacted in recognition of "the profound impact of man's activity on the interrelations of all components of the natural environment, [and] . . . the critical importance of restoring and maintaining environmental quality to the overall welfare . . . of man." 42 U.S.C. § 4331. NEPA "prescribes the necessary process by which federal agencies must take a hard look at the environmental consequences of the proposed courses of action." *Pennaco Energy, Inc. v. U.S. Dept. of Interior*, 377 F.3d 1147, 1150 (10th Cir. 2004) (internal quotations omitted). At bottom, NEPA "insure[s] a fully informed and well-considered decision," *see Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 558 (1978), especially when proposed activity may "significantly affect[] the quality of the human environment." 42 U.S.C. § 4332(2)(C).

Accordingly, NEPA requires all agencies that propose a "major federal action" that significantly affects the quality of the environment to prepare an environmental impact

statement ("EIS") that describes the "environmental impact of the action; unavoidable adverse environmental effects; alternatives to the action; relationship between the short-term uses and long-term productivity of the affected environment; and irretrievable and irreversible commitments of resources should the action be implemented." *Catron County Bd. of Comm'rs, N.M. v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1434 (10th Cir. 1996) (citing 42 U.S.C. § 4332(2)(C)(i)–(v)). If the impact of the major federal action on the environment is uncertain, the agency must prepare an environmental assessment ("EA") to determine whether the impact will be significant such that an EIS is required. *Id.* (citing 42 U.S.C. § 4332(2)(E)). An EA and/or an EIS is also required when an RMP is to be amended. *See* 43 C.F.R. § 1610.5-5. Notwithstanding these mandates, regulations provide for "emergency" exceptions:

> Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of these regulations, the Federal agency taking the action should consult with the Council about alternative arrangements. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

40 C.F.R. § 1506.11. In this way, agencies must comply with NEPA's requirements "to the fullest extent possible." 42 U.S.C. § 4332.

D.     National Defense Authorization Act

The NDAA is enacted each fiscal year to specify the budget needs for the Department of Defense. *See* National Defense Authorization Act for Fiscal Year 2000, Pub. L. No. 106-65, 113 Stat. 512 (1999). The NDAA authorizes appropriations for

Department of Defense military activities, including military construction and defense activities for the Department of Energy. *Id.*

On October 5, 1999, Congress enacted § 2815 of the NDAA, which affected Utah's public lands "adjacent or near to the Utah Test and Training Range and Dugway Proving Grounds or beneath Military Operating Areas, Restricted Areas, and airspace that make up the Utah Test and Training Range." NDAA § 2815(a), 113 Stat. 512, 852 (1999). The NDAA provided in § 2815(d) that "the Secretary of Interior may not proceed with any amendment of any individual resource management plan" until the Secretary of Defense submits a study to Congress evaluating the impact of any proposed changes to land management plans upon military training, testing, and operational readiness. NDAA § 2815(d), 113 Stat. 512, 852 (1999).

## II. BACKGROUND

At issue is whether the BLM acted within its authority when it imposed restrictions on ORV use in Box Elder County and Grand County, Utah, from 1999 through 2003.

A.     Box Elder County

Pursuant to FLPMA, the BLM has adopted RMPs for its Utah lands. The Box Elder RMP was adopted in 1986 and designates the vast majority of land as open to ORV use. In 1999, however, the BLM published a Notice of Closure of Public Lands ("1999 Box Elder Order"), which closed land that had been previously designated as open. The closure was ordered seasonally, from January through April, and the authority for the closure was listed as 43 C.F.R. §§ 8341.2 and 8364.1. *See* 64 Fed. Reg. 22639-02. The

order reads as follows:

> Notice is hereby given that effective immediately, the public lands within Broad Hollow Unit, Kilgore Basin Unit, Meadows Unit . . . are seasonally closed from January 1 to April 30 to all motorized vehicle use. The purpose of this closure is to protect wildlife, including critical deer and sage grouse habitat. Exemptions to this closure will apply to administrative personnel of the Bureau of Land Management, BLM authorized permittees and Law Enforcement Personnel. Other exemptions to this closure order may be made on a case by case basis by the authorized officer. This seasonal closure will remain in effect until further notice.
> . . . .
> The authority for this closure is 43 C.F.R. § 8341.2 and 43 C.F.R. § 8364.1.

*Id.*

In 2000, the BLM published another closure order ("2000 Box Elder Order"), which temporarily closed selected lands to ORV use regardless of the season. *See* 65 Fed. Reg. 16410-01. Specifically, the order stated:

> Notice is hereby given that effective immediately, selected public lands administered by the Bureau of Land Management (BLM), Salt Lake Field Office, within western Box Elder County are closed to off road vehicle (ORV) (also commonly referred to as off highway vehicle—OHV) use on an interim emergency basis. This action will allow BLM to address concerns related to unrestricted cross country travel in the specific places where we now have resource damage. The purpose of this closure is to protect wildlife, wildlife habitat, rangeland resources, soil, vegetation, cultural resources, historical resources, and other resources from ongoing and imminent adverse impacts from ORV use. . . . This emergency closure will remain in effect until BLM completes a land use plan amendment for OHV management.

*Id.* Like the 1999 Box Elder Order, the 2000 Box Elder Order cited 43 C.F.R. §§ 8341.2 and 8364.1 as authorizing the closure.

In 2003, after USA-ALL filed this action, the BLM revoked both the 1999 and

-11-

2000 Box Elder Orders and simultaneously issued a new order. That order ("2003 Box Elder Order") stated that in five areas of the county ORVs may only be used on designated routes. The remaining public lands were to be managed according to the 1986 Box Elder RMP. The 2003 Box Elder Order provided:

> Notice is hereby given that effective immediately, the Bureau of Land Management (BLM), Salt Lake Field Office, revokes the seasonal Notice of Closure of Public Lands published on April 27, 1999 (64 FR 22639 (1999)) and the Notice of Closure of Public Lands published on March 28, 2000 (65 FR 16410 (2000)). Notice is hereby given that effective immediately, ORV use in the following five areas of Box Elder County is limited to designated routes: Devils Playground (9838 acres), Grouse Creek Mountains (52493 acres), Hogup Mountains (51698 acres), Pilot Mountains (62654 acres), and Wildcat Hills (12640 acres). The remaining public lands in Box Elder County will be managed according to the Box Elder Resource Management Plan.

68 Fed. Reg. 20167-02.

Citing only 43 C.F.R. § 8341.2 as the authority for the closure order, the 2003 Box Elder Order further provided that "[t]his limitation will remain in effect until the considerable adverse effects giving rise to this limitation are eliminated and measures are implemented to prevent recurrence of these adverse effects." *Id.*

B.    Grand County

As with Box Elder County, land use in Grand County is also managed by an RMP adopted in the mid-1980s. In January 2001, the BLM published two notices related to ORV use. In the first notice ("Grand County ORV Restrictions"), ORV use in five areas was to be limited to existing roads and trails only. The notice cited FLPMA, Executive Orders 11644 and 11989, and 43 C.F.R. §§ 8341.2 and 8364.1 as its authority, and stated:

-12-

This notice places restrictions on travel by off-road vehicles (ORVs) and mountain bikes on specific public land administered by the BLM Moab Field Office.[1] These actions are necessary to halt ongoing impacts and prevent future degradation of resource values. They are being implemented on an interim basis to protect resource values and public safety, pending revision of the Resource Management Plan (RMP) for the area administered by the BLM Moab Field Office.

66 Fed. Reg. 6659-01. The second notice ("Grand County Camping Restrictions"), which was published in order to support implementation of the Grand County ORV Restrictions, provided that camping involving vehicles would be limited to developed campgrounds and designated campsites. 66 Fed. Reg. 6658-01. Again, the BLM cited 43 C.F.R. § 8364.1 as its authority for the notice.

C.    Procedural History

On October 17, 2001, USA-ALL filed this suit in the District of Utah, contesting implementation of the 1999 and 2000 Box Elder Orders and the two Grand County restrictions under FLPMA, NEPA, FACA,[2] and the NDAA. USA-ALL asked the District Court to set aside the orders and restrictions under the APA. *See* 5 U.S.C. § 706(2). Southern Utah Wilderness Alliance, The Wilderness Society, Great Old Broads for Wilderness, and Wildlands CPR were permitted to intervene and defend the BLM's action. Thereafter, the BLM revoked the two Box Elder Orders and supplanted them with the 2003 Box Elder Order. Accordingly, the BLM argued in its answer to USA-ALL's

---

[1]The Moab Field Office oversees the management of public lands in Grand County.

[2]5 U.S.C. App. 2 § 1 *et seq.* USA-ALL later voluntarily dismissed its FACA claim.

-13-

complaint that the 2003 Box Elder Order mooted any argument related to the 1999 and 2000 Box Elder Orders. The BLM also sought to have the complaint dismissed for failure to state a claim as to the remaining orders. After extensive briefing and oral argument, the District Court agreed with the BLM on both issues, and in two memorandum dispositions dismissed with prejudice all of USA-ALL's causes of action. This appeal followed.

## III. DISCUSSION

A.    <u>Standard of Review</u>

Because none of the statutory or regulatory provisions in question provide for a private cause of action, the judicial review provisions of the APA govern this suit. *See* 5 U.S.C. § 702; *Colo. Envtl. Coal. v. Walker*, 353 F.3d 1221, 1234–35 (10th Cir. 2004). Under the APA, a reviewing court may set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 779–80 (10th Cir. 2006). "[T]he essential function of judicial review [of agency action] is a determination of (1) whether the agency acted within the scope of its authority, (2) whether the agency complied with prescribed procedures, and (3) whether the action is otherwise arbitrary, capricious or an abuse of discretion." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1574 (10th Cir. 1994). Only the second and third inquiries

will be undertaken in this appeal.[3]

To determine whether the agency complied with prescribed procedures, we must review the administrative record and applicable law. *Id.* To determine whether the agency's decision was arbitrary or capricious, we must "ascertain whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Id.* (footnote omitted). This standard also means that there must be a reasoned basis for the agency's action, and it must be supported by "substantial evidence." *Id.* "Evidence is substantial in the APA sense if it is enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion to be drawn is one of fact." *Id.* (internal quotation marks omitted). Finally, action will be deemed "arbitrary or capricious" if the explanation for the action "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

B.    The 1999 and 2000 Box Elder Orders are Moot.

Reviewing de novo, *see Disability Law Ctr. v. Millcreek Health Ctr.*, 428 F.3d 992, 996 (10th Cir. 2005), we agree with the District Court that USA-ALL's arguments relating to the 1999 and 2000 Box Elder Orders are moot. "Mootness is a threshold issue

---

[3]USA-ALL does ask this Court to "overturn" E.O. 11989, 43 C.F.R. § 8341.2, and 43 C.F.R. § 8364.1 because they are inconsistent with FLPMA and NEPA; if we were to do so, USA-ALL argues, the BLM would have had no authority for its actions. Because, however, this argument was raised for the first time on appeal, we do not entertain it. *See Cummings v. Norton*, 393 F.3d 1186, 1190 (10th Cir. 2005). Accordingly, our review is limited to whether the BLM acted in accordance with required procedures and whether its actions were arbitrary or capricious.

because the existence of a live case or controversy is a constitutional prerequisite to federal court jurisdiction." *McClendon v. City of Albuquerque*, 100 F.3d 863, 867 (10th Cir. 1996). Federal courts may adjudicate only actual controversies; as such a claim or appeal should be dismissed as moot when the controversy ceases to exist. *United States v. Seminole Nation of Okla.*, 321 F.3d 939, 943 (10th Cir. 2002). Because the BLM revoked the 1999 and 2000 orders, any controversy associated with these orders has been nullified.

Nevertheless, USA-ALL argues that its appeal falls within an exception to the mootness doctrine because the BLM's actions are "capable of repetition, yet evading review." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982). This exception applies "when: (1) the duration of the challenged action is too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subjected to the same action again." *Disability Law Ctr.*, 428 F.3d at 996 (quotations and alterations omitted). There is no reasonable expectation that the BLM will re-issue the 1999 and 2000 Box Elder Orders because they have been superceded by the 2003 Box Elder Order. *See Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118, 1124 (9th Cir. 1997) (superceding agency opinion moots original opinion). Moreover, the 1999 and 2000 Box Elder Orders will not evade review because USA-ALL makes the same arguments with respect to those orders as it does with respect to the 2003 Box Elder Order, which this Court reviews in Part III.C–E. *See id.* (when superceding agency opinion is capable of review, exception to the mootness doctrine does not apply).

-16-

Accordingly, the portion of this appeal relating to the 1999 and 2000 Box Elder Orders is dismissed as moot.

C.    The BLM Complied with Procedures Mandated by FLPMA and its Action is Supported by Substantial Evidence.

1.    *The Restrictions Are Not "De Facto Amendments."*

USA-ALL contends that the 2003 Box Elder Order and the two Grand County restrictions must be nullified because they are "de facto amendments" to the Box Elder and Grand County RMPs that were issued without public notice and participation and without the BLM having first conducted an EA as required by FLPMA.  We disagree.

Although there is some support outside this jurisdiction for an argument relating to "de facto amendments," the cases of which this Court is aware have little—if any—bearing on the facts presented by this appeal.  *See, e.g.*, *House v. U.S. Forest Serv.*, 974 F. Supp. 1022 (E.D. Ky. 1997) (proposed timber sale approved on the basis of three policies that constituted "significant" changes to land use plan requires same public comment as land use plan itself); *Or. Natural Res. Council Fund v. Forsgren*, 252 F. Supp. 2d 1088 (D. Or. 2003) (narrower definition of lynx habitat which led to reduction in such habitat is "significant" change to land use plan and requires public comment and preparation of EIS).  This Court is not aware of any authority indicating that a closure order promulgated pursuant to 43 C.F.R. §§ 8341.2 and 8364.1 constitutes a "de facto" amendment to an RMP, thus triggering compliance with FLPMA's public participation

-17-

and EA requirements. To the contrary, the Ninth Circuit has specifically held that "[n]othing in [§ 8364.1] or the authorizing statutory sections requires public hearings for temporary closures" to vehicular use—thereby foreclosing any argument that temporary ORV closures are essentially RMP amendments. *Humboldt County v. United States*, 684 F.2d 1276, 1283 (9th Cir. 1982).

Indeed, courts have consistently emphasized the distinction between the initial ORV-route-designation process reflected in an RMP—which is subject to public comment and requires the promulgation of an EA—and closures of those designated routes authorized under regulations promulgated pursuant to FLPMA, NEPA, and other statutes. For example, the Central District of California noted that:

> The regulations took into account the amendments to E.O. 11,684 effected E.O. 11,989, 3 C.F.R. 120 (1978). *See* 43 C.F.R. s 8341.2. E.O. 11,989, among other things, amended E.O. 11,644 so as to require closure of ORV areas and trails whenever an agency finds that ORV use will cause or is causing "considerable adverse effects." *This closure standard is to be distinguished from the initial designation criteria set forth in E.O. 11,644 and mirrored in 43 C.F.R. § 8342.1.*

*Am. Motorcyclist Ass'n v. Watt*, 543 F. Supp. 789, 796 n.14 (C.D. Cal. 1982) (emphasis added); *see also Sierra Club*, 756 F.2d at 690 (stating that 43 C.F.R. § 8341.2 "creates a separate duty to close without regard to the designation process; it does not automatically become inoperative once the Secretary exercises his discretion to designate the land."); *Am. Sand Ass'n v. U.S. Dept. of Interior*, 268 F. Supp. 2d 1250, 1255 (S.D. Cal. 2003) (closure order under 43 C.F.R. §§ 8341.2 and 8364.1 done in accordance with FLPMA).

Moreover, this exemption of OHV travel restrictions from the resource

management planning process reflects the realities of public land management and allows the BLM to timely comply with its statutory mandate to "take any action necessary to prevent unnecessary or undue degradation of the lands." 43 U.S.C. § 1732(b). Because the RMP revision process is much more time-consuming than enacting a temporary closure order, the BLM could not effectively respond to resource degradation only through the formal planning process. In this way, the BLM's exercise of its authority to address resource degradation—whether done pursuant to 43 C.F.R. § 8342.1(a) or 43 C.F.R. § 8364.1—is not "de facto" planning. Rather, it is a lawful discharge of the BLM's duty, independent of the planning process, to prevent undue degradation of resources.

2.      *An Emergency Is Not Required Before the BLM May Close Lands to ORV Use, and Its Decision is Supported by Substantial Evidence.*

USA-ALL also argues that there was no substantial evidence supporting a finding of an emergency, which it contends is necessary before the BLM may place ORV restrictions on the public lands. This contention is completely without merit. The regulation authorizing the challenged orders does not use the word "emergency," nor does it contain any language from which a requirement of an emergency could be inferred. *See* 43 C.F.R. § 8341.2; *see also Am. Sand Dune Ass'n*, 268 F. Supp. 2d at 1254 (holding that no emergency is necessary under FLPMA for the BLM to issue ORV closure orders). Rather, the BLM's authority under 43 C.F.R. § 8341.2 is tied to the existence of considerable adverse effects that are being caused by or will be caused by ORV use, and

our review of the record convinces us that substantial evidence supports such a finding in this case. For this reason, we also disagree with USA-ALL's contention that the BLM's explanation as to why it issued the closure orders is implausible.

D.    NEPA

Next, USA-ALL appears to argue that because NEPA requires preparation of an EA prior to the promulgation of an RMP, *see State of Utah v. Babbitt*, 137 F.3d 1193, 1214 (10th Cir. 1998), NEPA similarly requires preparation of an EA prior to the amendment of an RMP. We have just held, however, that the closure orders at issue are not amendments. Accordingly, we reject this argument.[4]

_____

[4]USA-ALL's argument on this point is not entirely clear. Referencing 42 U.S.C. § 4332(2)(E), which states that "all agencies of the Federal Government shall . . . study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," USA-ALL contends that the BLM was required to prepare an EA. Although an agency must comply with § 4332(2)(E) in preparing an EA, *see* 40 C.F.R. § 1508.9(b), this subsection is not what triggers the need to prepare an EA. Rather, an agency may choose to prepare an EA "[w]hen it is unclear whether a proposed action requires an EIS." *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1274 (10th Cir. 2004). An agency is required to prepare an EIS only for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Further muddying the water, USA-ALL makes no attempt to argue how an ORV closure order or camping restriction constitutes either a "proposal" within the meaning of subsection (E) or a "major federal action" under subsection (C). Finally, we note that some courts have concluded that actions taken to protect the environment need not be predicated by an EA or an EIS. *See Am. Sand Ass'n*, 268 F. Supp. 2d at 1253 ("An environmental assessment or an environmental impact statement is not necessary for federal actions that conserve the environment.") (citing *Douglas County v. Babbitt*, 48 F.3d 1495, 1505 (9th Cir. 1995)); *Nat'l Assoc. of Property Owners v. United States*, 499 F. Supp. 1223, 1265 (D. Minn. 1980) ("In essence, plaintiffs' claim is that the Department of Agriculture must prepare an EIS in order to leave nature alone. The Court is not moved by this argument."). Therefore, to the extent USA-ALL contends that the issuance of a closure

In addition, for the first time before this Court, USA-ALL maintains that NEPA compliance is necessary for the closure of public transportation routes, which it apparently understands Utah's wilderness areas to be. This issue, however, was not presented to the District Court; therefore, we do not consider it further. *See Cummings*, 393 F.3d at 1190.

E.     NDAA

The District Court properly dismissed USA-ALL's claims under the NDAA for lack of standing. A party must first have standing before its claim may be adjudicated on the merits. "The standing inquiry requires us to consider both constitutional limits on federal court jurisdiction and prudential limitations on its exercise." *Bd. of County Comm'rs of Sweetwater County v. Geringer*, 297 F.3d 1108, 1111 (10th Cir. 2002). There is no dispute that USA-ALL meets the requirements of constitutional standing.

With respect to prudential standing, federal courts have long recognized that a plaintiff must satisfy the following prudential principles: "(1) the plaintiff generally must assert his or her own legal rights; (2) the court must refrain from adjudicating generalized grievances most appropriately addressed by one of the other branches of government; and (3) the plaintiff's complaint must fall within the zone of interests to be protected or

---

order pursuant to 43 C.F.R. § 8341.2(a) constitutes either a "proposal" or a "major Federal action," we decline to address the issue. *See Craven v. Univ. of Colo. Hosp. Auth.*, 260 F.3d 1218, 1226 (10th Cir. 2001) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review.").

regulated by the statute . . . in question." *Mount Evans Co. v. Madigan,* 14 F.3d 1444, 1450–51 (10th Cir. 1994) (internal quotation omitted). "The zone of interests test is a guide for deciding whether, in view of Congress' evident intent to make agency action presumptively reviewable, a particular plaintiff should be heard to complain of a particular agency decision." *Id.* at 1452. The burden to establish prudential standing is on the plaintiff bringing the action. *See id.* at 1450.

In our view, USA-ALL has not demonstrated that its interest in using the public lands for ORV and other recreational activities fall within the zone of interests protected by the NDAA. Therefore, USA-ALL may not challenge the BLM's action as violating the NDAA.

F.      Factory Butte

Finally, we conclude that the District Court properly concluded that USA-ALL lacked standing to challenge BLM-issued signs encouraging, but not requiring, ORV users to stay on particular routes on land designated as "open." According to USA-ALL, its members have refrained from traveling away from those particular routes because they fear that the BLM will retaliate by closing those areas if those members fail to comply with the BLM's request. The possibility of a mandatory closure, however, is far from imminent, and therefore USA-ALL has failed to allege an "injury in fact" for purposes of standing. *See Bear Lodge Multiple Use Ass'n v. Babbitt*, 175 F.3d 814, 821–22 (10th Cir. 1999).

## IV. CONCLUSION

The BLM complied with required procedures under FLPMA and NEPA when it enacted the 2003 Box Elder Order and the Grand County ORV and Camping Restrictions, the BLM's decision close various public lands to ORV use was supported by substantial evidence, and the BLM's reasoning in doing so was not implausible. Further, USA-ALL does not have standing to challenge the Orders and Restrictions under the NDAA, and it also lacks standing to challenge the posting of signs encouraging ORV use only on particular trails. We therefore AFFIRM.